The METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, Tennessee, et al., Appellants,

v.

Earl C. SHACKLETT, Jr., and the Tennessee Alcoholic Beverage Commission, Appellees.

The METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, Tennessee, et al., Appellants-Appellees,

v.

Bernard L. WEINSTEIN and the Tennessee Alcoholic Beverage Commission et al., Appellees-Appellants.

Supreme Court of Tennessee.

Jan. 24, 1977.

Robert W. Rutherford, Metro Department of Law, Nashville, for appellants.

Thomas A. Wiseman Jr., Nashville, William C. Koch, Jr., Asst. Atty. Gen., Nashville, Brooks McLemore, Jr., Atty. Gen. (of counsel), for appellees.

Robert E. L. Sutton, Franklin D. Brabson, William J. Faimon, Bart C. Durham, III, James R. Omer, David M. Pack, Walter S. Clark, Jr., Harris A. Gilbert, William R. Willis, Jr., John D. Lentz, Nashville, for appellees-appellants.

HARBISON, Justice.

In these consolidated cases review is sought by the Metropolitan Government of Nashville and Davidson County, Tennessee of the action of the Chancellor in ordering the issuance of nineteen certificates of good moral character and retail liquor licenses. Seven of these applications had been denied by the Tennessee Alcoholic Beverage Commission, but its action as to these was re-versed by the Chancellor. The Commission appeals from that portion of his decision.

Both the Alcoholic Beverage Commission and the Chancellor, upon an evidentiary record made before the Commission, held arbitrary and unreasonable a municipal ordinance of the Metropolitan Government restricting the location of retail package liquor stores to a specified or "segregated" area of the Urban Services District. It was stipulated that all of the applicants whose cases are now before the Court are persons of good moral character according to "traditional guidelines". The Metropolitan Government declined to issue certificates of such character to the applicants because their proposed liquor outlets were located outside of the area specified in the municipal ordinance. On review pursuant to T.C.A. § 57–121, the Commission granted twelve applications for locations within the Urban Services District and denied the seven involved in its appeal here.[1] The Chancellor reversed this latter action on the ground that the Commission had established no satisfactory criteria or standards for the granting of some applications and denial of others.

Jurisdictional and procedural issues were raised in the trial court and are urged here by the Tennessee Alcoholic Beverage Commission. We will dispose of these before considering the other issues on appeal.

I. *Jurisdiction of the Chancery Court and Review under the Uniform Administrative Procedures Act*

Prior to the adoption and effective date of the Uniform Administrative Procedures Act, T.C.A. §§ 4–507, *et seq.*, review of orders of the Alcoholic Beverage Commission was had in the first instance by petition for common law writ of certiorari to the Circuit Court of Davidson County. T.C.A. § 57–127. It was provided in that statute that review in the circuit court

---

1. Actually the Commission denied some twenty-four or more applications. In only nine cases was judicial review sought. Two of them involved proposed sites in the General Services District, and the Chancellor concurred with the Commission in denial of those because that District is not a "municipality" under the liquor laws involved here. No appeal has been taken in those two cases.

should be "solely upon the pleadings and the transcript of the proceedings before the commission, and neither party shall be entitled to introduce new evidence in the circuit court." Provision was made for direct appeal to the Supreme Court and re-examination there "of the whole matter of law and fact appearing in the record." These statutory provisions were made "the exclusive method of reviewing all orders of the commission issued pursuant to hearings authorized by §§ 57–106–57–151."

A number of reported cases dealing with liquor licenses and certificates of good moral character appear to have reached both the trial courts and this Court by actions in chancery, or some other method than the statutory provisions just cited. *See Boyd v. Burmaster,* 193 Tenn. 338, 246 S.W.2d 36 (1952); *State ex rel Brown v. McCanless,* 184 Tenn. 83, 195 S.W.2d 619 (1946). In those cases the foregoing statutory provisions were apparently not called to the attention of the Court, and they were not considered in the opinions.

In cases where the issue has been discussed, however, it is clear that, despite the broad wording of T.C.A. § 57–127 as to the scope of review, the courts have considered review as being confined to legal issues, such as whether the Commission acted illegally, arbitrarily, or fraudulently, or to determining whether factual findings of the Commission were supported by material evidence in the record. *See City of Chattanooga v. Tennessee Alcoholic Beverage Commission,* 525 S.W.2d 470, 478 (Tenn. 1975); *Little v. MacFarland,* 206 Tenn. 665, 337 S.W.2d 233 (1960).

All of the applications in the present case were considered by the Commission after the effective date of the Uniform Administrative Procedures Act. All were reviewed in the Chancery Court of Davidson County, rather than the Circuit Court, contrary to the insistence of the Commission that review lay exclusively in the latter court under the provisions of T.C.A. § 57–127.

The Uniform Administrative Procedures Act is a comprehensive statute, providing for proceedings before most of the state boards, commissions, departments or units of state government "authorized or required by any statute or constitutional provision to make rules or to determine contested cases." T.C.A. § 4–508(a). Some of the state departments or agencies are expressly exempted from the coverage of the Act, and the Governor is authorized to exempt others. The Act does not exempt the Tennessee Alcoholic Beverage Commission and no executive action exempting it has been cited.[2]

At T.C.A. § 4–525, it is expressly provided that the Act shall not be construed as being in derogation of the common law, but it shall be construed "as remedial legislation designed to clarify and bring uniformity to the procedure of state administrative agencies and judicial review of their determination . . .."

This section further provides that T.C.A. § 65–210, dealing with procedures before the Tennessee Public Service Commission, is not repealed by the Administrative Procedures, Act, but it is then stated:

"In any other case of conflict between §§ 4–507—4–527 and any procedural administrative statute, whether general or specific, §§ 4–507—4–527 shall control, however, compliance with the procedures prescribed by this statute does not obviate the necessity of complying with procedures prescribed by other sections of Tennessee Code Annotated." T.C.A. § 4–525(b).

■ It is a general principle of statutory construction that repeals by implication are not favored. However, in view of the stated legislative purpose in enacting the Uniform Administrative Procedures Act, we are of the opinion that the provisions for judicial review of orders of the Alcoholic Beverage Commission contained in T.C.A.

**2.** The provisions of this new and significant statute were discussed in a symposium published in the Memphis State University Law Review, Vol. 6, No. 2 (1976). One of the articles in the issue was devoted entirely to the coverage of the Act. *See* Blank, *Scope of the Tennessee Uniform Administrative Procedures Act,* 6 Memphis State L.Rev. 159 (1976).

§ 57–127 are superseded and repealed by T.C.A. § 4–507 et seq., to the extent of any conflict or inconsistency in the two sets of statutory provisions.

The scope of review in the trial court of an order of an administrative agency is defined in T.C.A. § 4–523(h). *See* Sewell, *Judicial Review and the Uniform Administrative Procedures Act,* 6 Memphis State L.Rev. 253, 274 (1976).

It is clear from the language of the statute that the review provided in the chancery court is in no sense a broad, or de novo, review. Review is confined to the record made before the agency, except in cases of "alleged irregularities in procedure before the agency, not shown in the record . .." T.C.A. § 4–523(g). The trial court is required to determine whether the agency acted within the scope of its statutory authority, and in conformity generally with statutory and constitutional provisions, whether it followed proper procedures, whether its decisions were arbitrary, capricious or in abuse of discretion, and whether its conclusions are supported by material and substantial evidence in the record. T.C.A. § 4–523(h).

As pointed out by Professor Sewell in the article cited above, these criteria for review of administrative actions are not particularly new and in the present cases do not differ greatly from standards employed under the former procedural statutes.

With respect to appellate review, provision is made for direct appeal to this Court "as in chancery cases." T.C.A. § 4–524. This language is not without difficulty. Ordinarily review of chancery cases on appeal is governed by T.C.A. § 27–301, which provides that an appealing party in an equity case may "have a reexamination . . of the whole matter of law and fact appearing in the record." Further, T.C.A. § 27–303 provides that in nonjury cases in law or equity, review may be had "upon a simple appeal, as now provided in equity cases . . . ." The scope of review in such cases "shall be de novo upon the record of the trial court, accompanied by a presumption of the correctness of the judgment or decree of the trial court, unless the preponderance of the evidence is otherwise."

We do not believe that the drafters of the Administrative Procedures Act intended that there be a broad, or de novo, review in this Court of the decision of a trial judge, when his action, initially, is confined to a narrow and statutorily prescribed review of the record made before the administrative agency. We consider that it would be impracticable for this Court to afford any broader or more comprehensive review to cases arising under the Act than is afforded to them by the trial court in the first instance, except, of course, this Court can review for the first time any new or additional evidence introduced in the chancery court with respect to "alleged irregularities in procedure" before the agency as provided in T.C.A. § 4–523(g). Therefore we do not deem the words "as in chancery cases" contained in T.C.A. § 4–524 to be definitive of the scope of review to be given such cases in this Court, but merely as descriptive of the general procedure to be followed in bringing cases from the chancery court to this Court, where procedures are not otherwise expressly set out in the Administrative Procedures Act itself.

We accordingly are of the opinion that these cases were correctly brought to the chancery court for review in the first instance, and that they have been properly appealed here pursuant to the provisions of the Administrative Procedures Act. The assignments of error made by the Alcoholic Beverage Commission as to these issues are overruled.

## II. Validity of the Metropolitan Ordinance

As presented to the Chancellor and to this Court, all of the substantive issues in the appeals of Metropolitan Government involve its ordinance creating a segregated zone for the location of retail liquor outlets. However, there is very little testimony in the record concerning the ordinance. An uncertified copy of what purports to be § 5–2–3 of the Metropolitan Ordinances was

filed before the Commission, and all parties have treated this as being the ordinance in question, creating a restricted zone. This zone is also depicted upon a map filed in evidence, and it was stipulated that if an official of the Metropolitan Government were called to testify, he would state that the map correctly shows the present boundaries of the segregated area.

There are references in the transcripts to other ordinances of the Metropolitan Government dealing with the regulation and location of liquor stores, but these ordinances have not been filed with the record on appeal.

█ It is a rather fundamental principle of evidence in this state that the courts cannot and do not take judicial notice of municipal ordinances, for the simple reason that they are not readily available and they may be amended at frequent intervals. In cases involving such ordinances, therefore, it is necessary for the parties to stipulate the existence and the accurate texts of ordinances, or else to prove the same through municipal officials, or by supplying certified copies in accordance with Rule 44 of the Tennessee Rules of Civil Procedure. This rule is not altered by the fact that a large municipality, such as the Metropolitan Government, may authorize codification and publication in official form of its collected ordinances, because, again, these ordinances frequently can be and are amended by subsequent action of the governing body. Judicial notice is frequently taken of matters of general knowledge, as a substitute for the production of evidence, but the courts of this state, as a general proposition, have never included municipal ordinances or regulations within the sphere of subjects to which judicial notice extends. See State ex rel Schmittou v. City of Nashville, 208 Tenn. 290, 345 S.W.2d 874 (1961); Guidi v. City of Memphis, 196 Tenn. 13, 263 S.W.2d 532 (1953); Brimer v. Jefferson City, 187 Tenn. 467, 216 S.W.2d 1 (1948); Grady v. Bryant, 506 S.W.2d 159 (Tenn.App. 1973).

In view of the stipulation of the parties, the Court accepts the definition of the segregated area of the Metropolitan Government as contained in the copy of the ordinance filed in the record, despite its lack of official certification. There is a total lack of evidence in the record, however, as to the history of this ordinance or the reasons for its being. The published copy filed in the record refers to a 1960 Code of the City of Nashville as its source. The latter is not before the Court. At one point in the record, counsel for the Metropolitan Government stated "I would say you could say the boundaries have been established since 1900 or before", with only "fairly insignificant" alterations. No witness testified in these cases as to how the present zone and its boundaries came to be established, or the reasons for their existence. Of course mere statements of counsel are not evidence or a substitute for testimony.

An all-out attack was made upon the Metropolitan ordinance in these cases. Some thirty-six or more applications for locations outside of the segregated zone were filed within a short time after the release of the opinions of this Court in the case of City of Chattanooga v. Tennessee Alcoholic Beverage Commission, 525 S.W.2d 470 (Tenn.1975). In the face of the deluge of applications for location of retail liquor outlets beyond the limits of the segregated area, the Metropolitan Government of Nashville and Davidson County has merely relied upon a general presumption of the validity of city ordinances, and has not offered a single witness to testify why the location of retail liquor stores should be confined to the zone shown in the subject ordinance, which admittedly was established no later than 1960, and probably was created many years prior to that date.

The record shows that one attempt was made to amend the segregated area by the Metropolitan Council after these proceedings began, but it does not appear that the amendment was adopted. In the hearings before the Alcoholic Beverage Commission counsel for the Metropolitan Government suggested on several occasions that the Commission grant additional time to Metropolitan officials to consider such an amend-

ment. These hearings extended over many months, commencing in October 1975 and concluding in April 1976. Final adjudication of the cases was not had in the Chancery Court until August, 1976. During this protracted period, while its ordinances were under sharp attack, the Metropolitan Government neither amended them nor called witnesses to justify them or defend them.

It is true that a number of pertinent facts were stipulated in the record. In addition to showing the established boundaries of the segregated zone, these stipulations revealed the population of the Urban Services District and the General Services District of Metropolitan Government, and included numerous census data as to population density and projections. From the stipulated facts the parties draw differing inferences and conclusions. Neither the history of the segregated zone, however, nor the reasons why Metropolitan officials feel that it is necessary were offered, in the face of multiple applications making a direct challenge to it.

The Urban Services District of the Metropolitan Government is designated by statute as a "municipality" for certain purposes, including the retail package sale of alcoholic beverages. T.C.A. § 6–3717. The record reveals that the boundaries of the Urban Services District have been substantially increased by annexation since the establishment of Metropolitan Government in 1963, but it does not show any changes or expansion of the established zone for retail liquor outlets. Unlike the ordinance under consideration in the *City of Chattanooga* case, *supra*, the Metropolitan ordinance does not prescribe any fixed number of retail outlets which may be established in the segregated area. Further, it is much larger, proportionately, than the zone established by the Chattanooga ordinance. It is, however, confined to the inner city of metropolitan Nashville, well away from the growing centers of population in the Urban Services District. While the zone for retail package stores has remained unchanged, its boundaries do not by any means coincide with the areas in which licenses for the

dispensation of liquor by the drink have been issued. Establishments dispensing liquor in this manner have been licensed widely throughout the Urban Services District. While the considerations for retail package sales may not be identical, nevertheless it is forcefully argued on behalf of the applicants for licenses in these cases that their applications are not, in most instances, being made in areas where alcoholic beverages are inaccessible.

Both the Alcoholic Beverage Commission and the Chancellor, in reviewing the record which was made before the Commission, concluded that the Metropolitan Government failed to justify the existence of its segregated area, at least in the sense that it failed to show any reason why the boundaries of the same should be considered ironclad or inflexible, and should not be extended into other areas of commercial activity and population growth. Both concluded that the ordinance was, therefore, arbitrary and unreasonable in light of changed conditions in the Urban Services District since the Metropolitan Government was instituted. From our review of the record, we are unable to say that these conclusions are without foundation or evidentiary support in the record.

In its first assignment of error the Metropolitan Government asserts that the Chancellor erred in holding that a municipality has no power to limit permissible locations for retail liquor stores. We do not find this to be the holding of either the Alcoholic Beverage Commission or the Chancellor. Both recognized that the existing Tennessee statutory scheme for regulation of such stores envisions a dual system of control, participated in both by the local governments and by the Commission. Indeed, in reviewing the various applications made to it, the Commission observed and enforced a number of metropolitan ordinances, other than that establishing the segregated zone. While these ordinances are not in the record, there are numerous references in the transcript showing adherence by the Commission to commercial zoning ordinances

and to others fixing residence requirements for licensees and prescribing the location of liquor outlets with respect to schools, churches, other liquor stores and the like. The only Metropolitan ordinance which was challenged and the only one declared to be unreasonable or arbitrary was that fixing the boundaries of the segregated zone. Repeatedly the hearing officers indicated that they would be willing to co-operate with the Metropolitan officials in the adjustment or relocation of these boundaries.

The supremacy of the state government and its regulating agency, the Tennessee Alcoholic Beverage Commission, in case of conflict between state and local regulatory measures, has been recognized by the courts since the enactment of the original statutes on the subject in 1939. Thus in the case of *State ex rel Brown v. McCanless*, 184 Tenn. 83, 195 S.W.2d 619 (1946), the Court sustained a regulation of the Commissioner of Finance and Taxation (predecessor of the Tennessee Alcoholic Beverage Commission) as against one promulgated by an ordinance of the City of Nashville. The Court said:

> "The legislature did not intend to subordinate the statutory authority of the commissioner of finance and taxation to the varying wishes of varying boards of mayor and aldermen. If there is a conflict between the municipal (mayor and aldermen) and State (commissioner) regulations, that imposed by the latter would prevail, since by Chapter 49 of the Public Acts of 1939 the final authority to license the sale of intoxicating liquor is in the commissioner. Action of the municipal authority is advisory merely." 184 Tenn. at 90, 195 S.W.2d at 622.

In the case of *City of Lakewood v. Tennessee Alcoholic Beverage Commission*, 219 Tenn. 510, 410 S.W.2d 897 (1967), this Court explicitly held that the Commission was authorized to pass upon the reasonableness of municipal ordinances, and that in reviewing ordinances it was exercising a quasi-judicial function which was expressly within its statutory grant of authority.

In light of these holdings, a municipality, faced with a broad-scaled attack upon its ordinances before the Commission, can hardly rely upon a general presumption of validity and make no active effort to justify the existence of ordinances brought squarely under the scrutiny of the Commission.

All parties in this litigation have cited and have given varying interpretations to the opinions of this Court in the case of *City of Chattanooga v. Tennessee Alcoholic Beverage Commission*, 525 S.W.2d 470 (1975). In that case a majority of the Court held that municipal governments have a legitimate role in regulating the *number* and location of retail package liquor outlets within their boundaries. Two members of the Court were of the opinion that local governments have had no statutory authority in this area since the enactment of certain amendments to the liquor statutes in 1949, other than in connection with the issuance of certificates of good moral character. While some members of the Court felt that cities might continue to exercise a degree of control through the granting or denial of certificates of good moral character, the majority disagreed and held that such certificates should be issued or denied without respect to the location or number of liquor stores, and solely with reference to the personal fitness of the applicants.

■ If accomplishing nothing else, perhaps the issuance of the various opinions by the members of this Court in that case pointed up the lack of clarity in the existing statutes, and the need for revision of the same. It is recognized by this Court that the General Assembly has plenary power over the subject of sale and distribution of alcoholic beverages, including the authority to prohibit the same entirely within this State if it should see fit to do so. *See Barnes v. City of Dayton*, 216 Tenn. 400, 392 S.W.2d 813 (1965); *State ex rel Major v. Cummings*, 178 Tenn. 378, 158 S.W.2d 713 (1942). It has been stated in at least two cases that no regulation of intoxicating liquor is beyond the police power of the state. *Terry v. Evans*, 189 Tenn. 345, 225 S.W.2d 255 (1949); *McCanless v. Klein*, 182 Tenn. 631, 188 S.W.2d 745 (1945).

In the exercise of its very broad powers in this field, the General Assembly could wholly exclude local governments from any role whatever and place exclusive control of the sale and distribution of alcoholic beverages in the state government. It could even provide for a system of state-owned liquor stores, if it felt this were appropriate. On the other hand it could remove state government from regulation, and place the subject entirely in the hands of local government or, of course, it could remove all controls and permit alcoholic beverages to be dispensed in the same manner as ordinary articles of food and drink.

The members of the Court have not altered their opinions on this subject since the decision in the City of Chattanooga case, supra. The majority still are of the opinion that under existing state statutes, local governments do have a role in prescribing the location and number of retail liquor outlets within their boundaries. Under the opinions of the plurality in that case, such control can no longer be exercised through the granting or withholding of certificates of good moral character, except in actual character investigations of the applicants. In the opinion of the majority of the members of the Court, however, regulatory ordinances on the subject, such as those of the Metropolitan Government which were upheld by the Commission in this case, are permissible. We have previously mentioned that the Commission recognized and applied Metropolitan ordinances dealing with the residence of applicants, the location of retail outlets with respect to educational institutions, churches, etc., and commercial zoning ordinances.

We are not prepared to hold, nor do we hold in this case, that a municipality could never establish a "segregated zone". In the present day of widespread commercial activity and the grouping of retail outlets in shopping centers near areas of great population density, however, real and substantial reasons for the existence of a segregated zone must be demonstrated by municipal authorities. It is sufficient to say that such reasons were not demonstrated in the present case, or in the Chattanooga case.

Even those members of the Court who believe that existing statutes authorize a legitimate role for local government in this field have difficulty with the position of the Metropolitan Government as developed in the present records. From the standpoint of inspection, regulation, police protection or the general welfare, it is possible that a segregated zone such as that established by the Metropolitan Government may serve a legitimate purpose. Such ordinances have been upheld in a number of other states. See 45 Am.Jur.2d, Intoxicating Liquors, § 139. On the other hand, in a day of rapid transit in a large urban community, such a zone may be utterly useless. These are matters of proof, to be established by competent evidence. The Metropolitan Government simply offered none, in the face of persuasive evidence by the applicants that they should be permitted licenses near shopping centers and other commercial areas.

As pointed out in the opinion of Justice Henry in the City of Chattanooga case, the regulation of the liquor industry is frequently an emotionally-charged issue. If, as the majority of this Court have concluded, present statutes do authorize the existence of a dual system of control, with the State and its agencies having the dominant role, it is indeed unfortunate when conflicts and friction develop between the regulatory bodies. In the absence of further legislative action on the subject, however, we are constrained to hold, as the Court did in the City of Lakewood case, supra, that the Commission has the authority to review local ordinances and to determine their reasonableness or consistency with state statutes and policy. The action of the Commission itself is subject to judicial review. As previously stated, from our review of the record we are unable to reach any different conclusions from those expressed by the Chancellor when he upheld the action of the Commission.

The Metropolitan Government has not challenged on appeal the qualifications of any of the twelve applicants involved in its

appeal. Its assignments of error deal only with its ordinance creating a segregated zone and the application of that single ordinance in the denial of certificates of good moral character. We therefore have not deemed it necessary to discuss the individual applications separately.

The assignments of error of the Metropolitan Government in each of the cases which it appealed are overruled.

### III. Appeal of the Alcoholic Beverage Commission

■ The Alcoholic Beverage Commission considered a massive group of applications for retail liquor licenses outside of the segregated zone of the Urban Services District in hearings held between October 1975 and April 1976. Ultimately it granted twelve applications and denied the remainder. Nine of the persons whose applications were denied filed petitions for judicial review in the Chancery Court under the Uniform Administrative Procedures Act, and seven of these remain in the case before this Court.

After concluding that the Metropolitan ordinance creating a segregated zone was arbitrary and unreasonable, the Chancellor overruled the assignments of error made to him by the Metropolitan Government, and affirmed the Commission in granting the twelve applications involved in the Metropolitan Government's appeal.

With respect to the seven applicants who had been denied a license, however, the Chancellor concluded that the Commission itself had acted arbitrarily and capriciously, and without established criteria to differentiate between those applications which were granted and those which were denied. He accordingly ordered all seven of these applications to be granted, apparently assuming in each case that all requirements of state law and of local ordinances had been complied with by the applicants, other than with respect to the location of their proposed outlets.

This assumption on the part of the Chancellor is not borne out by an examination of the record. Unfortunately, the Chancellor probably was misled by the form and method in which the Commission disposed of all nineteen applications which were brought to him for review. Instead of making detailed findings of fact and conclusions of law in each case, with specific reference to each applicant, the Hearing Examiners wrote a six-page opinion, which was mimeographed and used in each of the cases. This opinion discusses in a general manner the approaches which the examiners utilized in granting some licenses and denying others. It summarizes the opinions of this Court in the *Chattanooga* case, *supra*, and contains the ultimate conclusion that the Metropolitan ordinance creating a segregated zone is arbitrary and unreasonable. After reciting several general factors which the Hearing Examiners had taken into account, including local ordinances, business ability of the applicants, desirability of the proposed sites, and other general statements, each order concludes abruptly with a recommendation that a particular license be granted or denied.

This form of findings of fact and conclusions of law does not comply with T.C.A. § 4–519, which requires that in contested cases

"A final decision shall include findings of fact, conclusions of law, and reasons for the ultimate decision. Findings of fact, if set forth in statutory language, shall be accompanied by a concise and explicit statement of the underlying facts supporting the findings."

None of the seven unsuccessful applicants could tell from the findings of the Hearing Examiners why his particular application was denied. Both the Chancellor and this Court are in the same situation.

Nevertheless, the liquor industry is highly regulated, and no individual seeking a retail liquor license has any inherent right to be granted one. *Safier v. Atkins*, 199 Tenn. 574, 288 S.W.2d 441 (1956). The Commission has wide discretion in the granting or denying of liquor licenses, and courts do not lightly interfere with the exercise thereof. *State ex rel Nixon v. McCanless*, 176 Tenn. 352, 354, 141 S.W.2d 885 (1940).

We have undertaken to examine the record in each of the seven cases in which applications were denied, and we are not convinced that the Commission acted as arbitrarily or capriciously as the Chancellor concluded, because there is material evidence apparent in at least some of the transcripts upon which denials could have been predicated. Unfortunately the pleadings before the Chancellor were cast in the most general terms, and neither in pleadings nor in briefs has counsel for the Commission delineated the reasons, on a case-by-case basis, upon which these seven applications could have been denied. We will discuss them briefly, however, before making a disposition of the assignments of error filed on behalf of the Commission to the action of the Chancellor in granting all seven applications.

In his application for a license, Mr. Emmett Webb, Jr., showed that he resided at an address in Williamson County, Tennessee. He testified before the Commission that he had lived in Williamson County during all of the time when his application for a retail liquor license in Metropolitan Nashville had been pending. There is, according to the record, an ordinance of the Metropolitan Government requiring that an applicant for a retail liquor license reside in Davidson County for at least two years prior to the date of his application. One of the questions contained on the application submitted by Mr. Webb to the Metropolitan Government was whether or not he had so resided in Davidson County, and his answer on the application was in the affirmative. Nevertheless, when he testified before the Commission, he testified that he had lived in Williamson County for more than two years prior to applying.

In his mimeographed proposed findings of fact and conclusions of law, applicable to all nineteen of the present cases, the Hearing Examiner stated:

"We have tried to observe city ordinances if they were reasonable and in at least one instance an applicant did not reside in Davidson County as required by city ordinance."

From our examination of the records, Mr. Webb was the only unsuccessful applicant who did not reside in Davidson County, so that the hearing examiner probably was referring to this application. He did not so state in his recommended findings, however, and the Commissioners simply entered a form order to the effect that Metropolitan Government had not acted arbitrarily or unreasonably in denying this application. From our review of the record, it appears that there may be material evidence to support this conclusion of the Commission.

In connection with the application of Thomas S. Garmon, the Metropolitan Government did not stipulate that his proposed liquor outlet was situated more than fifty feet from a private residence, as required by local ordinances. There is no evidence in the record that the site does lie more than the required distance from private residences, and, again, this may be a sufficient reason to support the Commission's conclusion that Metropolitan Government had not arbitrarily denied Mr. Garmon's application.

Two of the applicants who were denied did not seek new licenses but made requests for transfers of existing licenses. These were the cases of Thomas W. Moon and Paul L. Budslick, Jr.

There is, of course, no absolute right for the holder of a license at one prescribed location to transfer the same. The statutes on the subject provide:

"Except as expressly authorized, there shall be no transfer of any permit from the holder thereof to another, *nor, except in special instances to be fixed by rule or regulation of the commission, any transfer thereof from one location to another.*" T.C.A. § 57–125. (Emphasis added).

Whether the Commission has any rules governing such transfers simply does not appear in this record, but certainly neither of these persons can claim any vested right to a transfer. Mr. Moon had had a license for some three or four months on a liquor store which he had purchased on Eighth Avenue, North, and Mr. Budslick had had a license for a few months at a site located at

193 North First Street. There were several applications already pending before the Commission for new licenses in the general area where these applicants proposed to transfer. Therefore, again, in connection with these two cases it is not clear to us as a reviewing court that the Commission acted arbitrarily or capriciously in the denial of the transfer applications. It may have had sufficient reasons for doing so.

Its reasons for denial in the other three cases, those of Robert Alvin Burns, Mrs. Jane Eakes and Mel J. Friedland were not stated, but questions as to the desirability or appropriateness of each of their proposed sites do appear to have been raised in their respective hearings.

The Commission was perhaps faced with an unusual and unprecedented situation in dealing with a large number of applications in a city where it found a local regulatory ordinance to be invalid or insufficient. It is apparent from an examination of all of the records in these cases that the validity of the segregated zone was the central issue. Almost all other issues became blurred or pushed into the background. Many of the hearings were quite abbreviated. Nevertheless, on several occasions, the Hearing Examiner stated to counsel that the validity or invalidity of the segregated zone was not the sole criterion upon which a retail liquor license should be granted or denied to any particular applicant on petition to the Commission, even though this may have been the only reason assigned by Metropolitan Government for its original denial of a certificate of good moral character or a license transfer. The Commission is the primary regulating body, and must take into account many factors, most of which were simply sketched in very lightly or not treated at all in the instant hearings, because of the primary focus upon the ordinance restricting liquor store sites to downtown Nashville.

Since the hearings in the present case, and primarily as a result of the opinion of the Chancellor in reviewing them, the Commission has published in the Tennessee Administrative Register, Vol. 2, No. 9, under date of September 15, 1976, some emergency amendments to its rules, purporting to establish criteria and factors which it will take into account in cases where it finds a regulatory ordinance of local government to be arbitrary or unreasonable. It had not published such standards or criteria at the time of the hearings in question, but we have already stated that there does appear, at least in some of the applications which were denied, material evidence upon which the applications might have been denied, wholly unrelated to the issue of the segregated zone of Metropolitan Government.

For this reason, we reverse the action of the Chancellor in ordering all seven of these licenses granted as applied for, and remand all seven cases to the Commission for the entry of explicit and detailed findings of fact and conclusions of law in each case, showing why the application of each of the named individuals should or should not be granted. In its discretion the Commission may permit the introduction of further evidence, and its actions will be, of course, subject to further judicial review if desired. In light of the evidence which was adduced in the present records, we do not approve a blanket order directing that all of the licenses issue, nor are we satisfied with the denial of any of the applications without an express statement by the Commission of its reasons for such denial.

### IV. Conclusion

It results that the action of the Chancellor is affirmed, insofar as he upheld the action of the Commission in ordering the issuance of the twelve applications involved in the appeal of the Metropolitan Government. His action is reversed insofar as he ordered the seven other applications to be granted, and those seven cases are remanded to the Commission for further proceedings consistent herewith.

The costs in each of these consolidated cases are taxed to the respective applicants. T.C.A. § 57–127 expressly prohibits the taxation of costs against the Commission in all cases where review of its action is sought, and we do not deem it to be in the public

interest to tax costs to the Metropolitan Government in the cases of the twelve successful applicants. At least in these cases, we are of the opinion that the accrued costs should properly be regarded as a part of the expenses incurred in the licensing process.

COOPER, C. J., and FONES and BROCK, JJ., concur.

HENRY, J., not participating.