IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned On Brief July 23, 2002

**JAMES E. JOHNSON**
v.
**TENNESSEE BOARD OF MEDICAL EXAMINERS
and TENNESSEE DEPARTMENT OF HEALTH**

**Appeal from the Chancery Court for Davidson County**
**No. 01-58-1     Irvin H. Kilcrease, Jr., Chancellor**

**No. M2002-00048-COA-R3-CV - Filed March 19, 2003**

This case involves the revocation of a physician's medical license. A patient saw a physician regarding a chronic skin condition. A series of unorthodox treatment methods resulted in the patient having upper respiratory problems, pain, dizziness, blurred vision, a small stroke, infection, and an abscess that had to be surgically drained and removed. As a result, the Tennessee Department of Health filed charges against the physician. After an administrative hearing, the Tennessee Board of Medical Examiners found that the physician engaged in unprofessional and unethical conduct, committed acts of gross malpractice, and demonstrated a pattern of incompetence and ignorance in the course of medical practice. The Board revoked the physician's medical license and assessed civil penalties. The physician sought judicial review in the chancery court. The chancellor affirmed the civil penalties but reversed the Board's revocation of the physician's medical license. The Tennessee Department of Health and the Tennessee Board of Medical Examiners appeal, arguing that the trial court substituted its judgment for the judgment of the Board. We reverse the ruling of the trial court, finding that the Tennessee Board of Medical Examiners did not abuse its discretion, did not act arbitrarily or capriciously, and that its revocation of the physician's medical license was supported by substantial and material evidence. Thus, we reinstate the Board's decision to revoke the physician's medical license.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part
and Reversed in Part**

HOLLY KIRBY LILLARD, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

Paul G. Summers, Attorney General and Reporter, and Sue A. Sheldon, Senior Counsel, Office of the Attorney General, for appellants, Tennessee Board of Medical Examiners and Tennessee Department of Health.

James E. Johnson, Nashville, Tennessee, appellee, pro se.

**OPINION**

E.H. ("E.H.") had chronic skin problems. A friend of E.H.'s searched the internet for a physician to treat her skin condition, and found a business advertisement by Petitioner/Appellee James E. Johnson, M.D. ("Johnson"), a physician in Tennessee. E. H. saw Johnson for treatment of her skin condition.

After examining E.H., Johnson diagnosed her as having candidiasis, an infestation or overgrowth of yeast in her bloodstream and body. He initially prescribed garlic treatment to cure E.H.'s candidiasis. E. H., however, sought a "faster" remedy. Johnson then recommended intravenous hydrogen peroxide treatments as well as ozone therapy. E.H. declined the ozone therapy but agreed to the hydrogen peroxide treatments.

The hydrogen peroxide treatment was a hydrogen peroxide and saline solution administered intravenously into a vein in the arm, with each treatment taking approximately four hours. Johnson recommended thirteen such treatments. After E.H. had received approximately two intravenous hydrogen peroxide treatments, Johnson installed a PICC line[1] in her arm to facilitate the subsequent intravenous treatments. Just prior to receiving her fourth or fifth treatment, E. H. suffered pain in her head and dizziness. Johnson diagnosed this as a "mini-stroke." As treatment, Johnson administered large doses of vitamin C through intramuscular injections into E.H.'s buttocks. When E.H. later developed upper respiratory problems, Johnson gave her additional vitamin C injections. In total, E.H. received seven hydrogen peroxide treatments and three vitamin C treatments, for which she paid Johnson $4,500.

Later, E.H. began complaining of pain in her buttocks and hip area where the vitamin C was injected, indicating an infection in that area. Johnson told her that antibiotics were not compatible with the hydrogen peroxide therapy. Instead he prescribed charcoal poultice compresses, which he made by mixing charcoal and water in a coffee can. Johnson then soaked paper towels in the charcoal solution and affixed them to E.H.'s buttock with paper tape.

Not surprisingly, the pain in E.H.'s hip area worsened. Johnson finally referred her to a surgeon. The surgeon recommended that E.H. begin taking antibiotics and have an ultrasound test on her hip to determine the source of the pain. At the same time, the PICC line in E.H.'s arm for the hydrogen peroxide treatments caused her arm to become red and ache. E.H. then went to see her former physician, Dr. Sylvia Shoffner ("Dr. Shoffner"). Dr. Shoffner removed the PICC line and performed an ultrasound test on E.H.'s hip. The ultrasound revealed that E.H. had a baseball-sized abscess in her hip. E.H. was immediately hospitalized and the abscess was surgically removed.

On April 24, 2000, E.H. contacted the Respondent/Appellant, the Tennessee Department of Health ("TDOH") to file a complaint regarding Johnson. Following an investigation, TDOH filed

---

[1] A PICC line is a peripherally inserted central catheter that allows the patient to receive intravenous treatments without having needles frequently inserted into the veins.

a Notice of Charges against Johnson and requested that the Respondent/Appellant Tennessee Board of Medical Examiners ("Board") temporarily suspend Johnson's medical license. The Board issued an Order of Summary Suspension, in which it found that in October 1999, E.H. began seeing Johnson. The Order recited that Johnson diagnosed her as having polysystemic candidiasis; that Johnson told her that he could cure the illness using intravenous hydrogen peroxide treatments; that Johnson injected high doses of vitamin C into inappropriate injection sites that resulted in a large abscess that had to be surgically removed; that Johnson accepted barter payments from E.H.; and that Johnson advertised hydrogen peroxide therapy and ozone treatments on his internet web site. The Order of Summary Suspension concluded that, "as a result of the medical treatment received by [E.H.] from [Johnson], the patient was misdiagnosed, treated outside the standard of care, and suffered injury as a result." The Order of Summary Suspension also stated:

> The [f]indings of [f]act in this Order are sufficient to establish a violation by [Johnson] of the following provisions of the Division and laws and the Tennessee Medical Practice Act, T.C.A. §§ 63-1-101 *et seq.* and specifically, T.C.A. § 63-6-214[(b)(1), (b)(4), and (b)(15)[2]] for which disciplinary action up to and including summary suspension of licensure, pursuant to T.C.A. § 4-5-320(c),[[3]] is authorized. The Board specifically finds pursuant to T.C.A. § 63-6-214[(b)(1), (b)(4), and (b)(15)] that [Johnson's] actions constitute unprofessional, dishonorable, or unethical conduct; that he committed gross malpractice; and that he offered, undertook, or agreed to cure or treat a disease, injury, ailment, or infirmity by a secret means, method, device or instrumentality.

---

[2]Section 63-6-214 of the Tennessee Code Annotated, entitled "Grounds for license denial, suspension or revocation—Reporting misconduct," states in pertinent part:

(b)     The grounds upon which the board shall exercise such power include, but are not limited to:
. . . .
(1)     Unprofessional, dishonorable or unethical conduct;
. . . .
(4)     Gross malpractice, or a pattern of continued or repeated malpractice, ignorance, negligence or incompetence in the course of medical practice;
. . . .
(15)     Offering, undertaking or agreeing to cure or treat a disease, injury, ailment or infirmity by a secret means, method, device or instrumentality; . . .

Tenn. Code Ann. § 63-6-214 (b)(1), (b)(4), and (b)(15) (1997).

[3]Section 4-5-320(c) of the Tennessee Code Annotated provides in part: ". . . . If the agency finds that the public health, safety, or welfare imperatively requires emergency action, and incorporates a finding to that effect in its order, summary suspension of a license may be ordered pending proceedings for revocation in other action. . . ." Tenn. Code Ann. § 4-5-320(c) (1998).

The board further finds that pursuant [to] its findings of fact and pursuant to T.C.A. § 4-5-320(c) that the public health, safety, and welfare imperatively requires emergency action, and a summary suspension of the license to practice medicine currently held by [Johnson].

Thus, the Board ordered Johnson's license be temporarily suspended pending a final hearing. At the final hearing, the Order stated, the Board would "determine whether [Johnson] is guilty of violating the . . . Medical [Malpractice] Act," and if so, "whether [Johnson's] license should be continued on suspension, revoked, or whether other discipline should be imposed."

In its Notice of Charges filed against Johnson, TDOH asserted that, under section 63-6-214(b)(1)(4)(15) of the Tennessee Code Annotated, Johnson's actions constituted "[u]nprofessional, dishonorable, or unethical conduct"; "[g]ross malpractice, or a pattern of continued or repeated malpractice, ignorance or incompetence in the course of medical practice"; and "[o]ffering, undertaking or agreeing to cure or treat a disease, injury ailment or infirmity by secret means, method, device or instrumentality." In the Notice of Charges, TDOH proposed that Johnson be fined $1,000 for each of the eleven violations he committed, and gave notice of the date of the final hearing.

Johnson's administrative hearing before the Board was held on September 12, 2000. At the hearing, E.H. testified that she had suffered from skin ailments for seven years, and that her friend discovered Johnson's name on the internet. E.H. said that Johnson conducted blood tests and took a stool specimen from her, and that he ultimately diagnosed her with candidiasis. E.H. testified that Johnson told her that he did not want to use traditional medicines because previous studies conducted on E.H.'s liver showed abnormalities and traditional antibiotics might adversely affect her liver. Therefore, Johnson recommended intravenous hydrogen peroxide treatments. E. H. said that she received seven intravenous hydrogen peroxide treatments that each took four hours.[4] E. H. testified that, during one visit to Johnson for a hydrogen peroxide treatment, she had symptoms of an upper respiratory infection. To treat the upper respiratory infection, Johnson recommended vitamin C injections, telling her that antibiotics would aggravate her candidiasis.

At the hearing, E.H. also described the vitamin C injections. E.H. testified that, for the injections, Johnson used a "very large" syringe, about the size of a "magic marker." She said that, "a couple of times," Johnson injected the vitamin C "more in towards the rectum, and at the very end of the cheek of the buttock, as opposed to up on the hips, where you normally think of getting shots . . . ." E.H. noted that Johnson "felt around a lot" when he administered the vitamin C shots because "there was a lot of knots in my buttocks, that he was trying to miss with the injections." She received two vitamin C treatments for her upper respiratory complaints. Later, while waiting to get into a sun bed, E.H. began to experience dizziness, sudden headache, and blurred vision. Johnson diagnosed this episode as a "mini-stroke." As treatment for this, Johnson administered a third round

_____

[4]E.H. testified that she brought her own chair, a recliner, to Johnson's office. Presumably, this was to make her more comfortable for the lengthy hydrogen peroxide treatments.

-4-

of vitamin C injections, explaining that the vitamin C injections would "help my body deal with that stress and trauma of the stroke."

E.H. also testified that the PICC line inserted in her arm to facilitate the series of intravenous hydrogen peroxide treatments became loose, that there was an opening between the tape holding the PICC line and her skin, and that her arm became red and ached where the PICC line was inserted. When E.H. told Johnson about this, Johnson told her that re-dressing the PICC line was not included in her pricing plan. He did, however, change the dressing, for which he charged her an additional fee.

Next, E. H. testified that a small knot appeared on her right buttock. The knot became sore, and, within a few days, grew larger. To treat this, Johnson applied a charcoal poultice. When this did not solve the problem, Johnson finally recommended that E.H. see a surgeon. E.H. testified that the surgeon recommended by Johnson was unfamiliar with candidiasis, and the surgeon recommended antibiotics and an ultrasound test to determine the source of the pain in her buttock. Considering that this recommendation was at odds with Johnson's opinion that she should not use antibiotics, and considering the discomfort in her arm from the loose PICC line, E.H. decided to get a second opinion. E.H. then visited Dr. Shoffner, her former physician.

Dr. Shoffner testified at the hearing as well. Dr. Shoffner said that E.H. visited her and had a "large area of erythema, induration, warmth . . . in the middle of the right buttock."[5] Dr. Shoffner testified that intramuscular injections, such as the injections of vitamin C given to E.H., should not be given near the crease of the buttocks because doing so could irritate or inflame a large nerve going down the middle of the buttocks. Dr. Shoffner noted: " . . . I just have never heard of anybody giving an injection, an intramuscular injection, within the crease, close to the rectum. That seemed extremely inappropriate to me."

Regarding E.H.'s inflamed PICC line, Dr. Shoffner testified that it had erythema around it, that it became purulent,[6] and that the dressing looked awful. "It was just old, and—and it just looked terrible," stated Dr. Shoffner. Concerned that the PICC line would result in a systemic infection, Dr. Shoffner removed it.

Dr. Shoffner said that the blood tests she performed on E.H. showed no indication of candida in the blood. Even if E.H. had had candida in her blood, Dr. Shoffner testified, intravenous hydrogen peroxide treatments were "[a]bsolutely not" the appropriate treatment for candida. Dr. Shoffner explained that there was a difference between vaginal or urinary candidiasis on one hand, and systemic candidiasis, or candidiasis of the blood on the other. She said that typical sufferers of systemic candidiasis are "[c]ritically ill patients . . . undergoing a lot of [intravenous] antibiotics, or they're a dialysis patient, or they're chemotherapy patients," and that candidiasis is properly treated

---

[5]Erythema means abnormal redness; induration is hard swelling.

[6]Purulent means containing or secreting pus.

with the use of one of two antifungals. As to the vitamin C injections, Dr. Shoffner noted that vitamin C does not have to be injected into a patient because it is readily absorbed into the gastrointestinal tract, and therefore, can be administered orally. Dr. Shoffner testified unequivocally that injection of hydrogen peroxide or vitamin C as a remedy for candidiasis was not within the standard of care, and that injecting vitamin C into a patient near the crease of the buttocks was not within the standard of care.

Dr. Shoffner also testified about the application of a charcoal poultice to the infection at the site of the vitamin C injections. Dr. Shoffner stated: "You have an infection, you have a pocket of fluid, that needs to be drained. You can put charcoal on it for years to come. You need to drain [the abscess], and you need to treat that with [intravenous] antibiotics."

At the hearing, TDOH also proffered the testimony of an expert witness, Dr. James Roth ("Dr. Roth"). Dr. Roth testified that, in his experience, there was never a proper use for intravenous administration of hydrogen peroxide, and that studies showed that it could in fact cause convulsions, hemolytic anemia, brain gas embolism, cardiomegaly, and death. He acknowledged that there were two studies, one in 1969 and one in 1996, that supported the use of hydrogen peroxide injections, but maintained that intravenous hydrogen peroxide injections were not appropriate medical treatment. Dr. Roth noted that intravenous administration of hydrogen peroxide is not an FDA-approved use of hydrogen peroxide.

Dr. Roth also testified about the ozone treatment that Johnson advertised and recommended to E.H. but which E.H. declined. Dr. Roth testified that it is not legal to sell ozone generators in the United States, that ozone is a poisonous gas, and that he had not found "anyplace where the use of ozone therapy is efficacious in the treatment for any disease process, via [an] inhalation or injection route of any form."

Next, Petitioner/Appellee Johnson testified. Johnson stated that E.H. came to see him because she sought an alternative approach to her illnesses. He admitted that he treated her by administering intravenous hydrogen peroxide treatments. Johnson said that he was very familiar with one of the physicians whose study was noted by Dr. Roth, and Johnson cited two additional studies, both occurring in approximately 1920, that supported the use of hydrogen peroxide treatments. Johnson asserted that he believed that the use of intravenous hydrogen peroxide treatments was within the standard of care in the Nashville medical community.

Johnson testified that he administered vitamin C injections to E.H. because of her gastrointestinal problems. Johnson said that he administered shots to the lower quadrant of E.H.'s buttock, but that he did not recall injecting E.H. near the rectum or in the crease of her buttocks. Johnson testified that he never saw swelling or redness around E.H.'s PICC line, and that he used paper towels and paper tape to apply the charcoal poultice to E.H., rather than sterile gauze and tape, because there was no open wound, and also "so that the patient can do it at home."

Johnson also recounted his training in alternative medicine. Johnson stated that, approximately five years prior to the administrative hearing, he attended a two-week alternative medicine seminar. Johnson also said that in 1988 he spent some time at the Wildwood Sanitarium, an alternative medicine hospital in Georgia. He testified that his most recent training in alternative medicine had been self-study.

After Johnson's testimony, the administrative judge presiding over the hearing charged the Board with its responsibilities, specifying that the State must prove its allegations by a preponderance of the evidence, that the Board must limit its inquiry to the allegations in TDOH's Notice of Hearing, and that the Board's order should include findings of fact, conclusions of law, appropriate penalties, if any, and finally, policy reasons for its decision.

The Board members then discussed the possible revocation of Johnson's medical license. The discussion included the following:

> Ms. McElroy: Okay. I have a question. Can he practice what he's practicing [alternative medicine] without a license legally, if we don't consider a standard medical practice?
>
> Dr. Starnes: He is diagnosing, he's treating. That's the practice of medicine. He cannot do that without a license.
>
> Dr. Edmonson: In my view, the license action is not related to whether or not he believes in alternative medicine or whether he doesn't believe in it. It's just a certain standard that a patient in the state of Tennessee is entitled to when he shows up in the office with a doctor with an M.D. degree, I think.

Following this discussion, the Board members voted to revoke Johnson's medical license.

In its written Order revoking Johnson's medical license, the Board found that Johnson diagnosed E.H. as having polysystemic candidiasis; that Johnson recommended that he treat her illness with intravenous hydrogen peroxide treatments and also recommended ozone treatments; that Johnson administered vitamin C injections into E.H's hip and buttock area in inappropriate injection sites; that there was "no medical substantiation of the diagnosis reached by [Johnson]"; that Johnson "violated the standard of care in the community through his use of hydrogen peroxide [intravenous] treatments for the treatment of candidiasis"; and also that "the patient suffered an injury as a result of said treatment." The Board concluded that Johnson engaged in unethical and unprofessional conduct as contemplated in section 63-6-214(b)(1) of the Tennessee Code Annotated, and that his treatment of E.H. "constituted gross malpractice, a pattern of continued or repeated malpractice, and incompetence and ignorance in the course of medical practice pursuant to T.C.A. § 63-6-214(b)(4)." The Board, for the welfare and benefit of the citizens of Tennessee, ordered that Johnson's license be revoked, and that he be assessed $11,000 in civil penalties.

Johnson then filed a petition for judicial review of the Board's order in the Chancery Court of Davidson County, pursuant to section 4-5-322 of the Tennessee Code Annotated. Johnson argued that the Board abused its discretion in revoking his license and imposing civil penalties, and that the Board's actions were not supported by the evidence in the record.

Pursuant to section 4-5-322(g), the chancery court reviewed the Board's decision without a jury, based on the record of the administrative hearing. The statute sets forth the standard for the chancery court's review of the Board's decision:

> (h) The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
>
> (1) In violation of constitutional or statutory provisions;
>
> (2) In excess of the statutory authority of the agency;
>
> (3) Made upon unlawful procedure;
>
> (4) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
>
> (5) Unsupported by evidence which is both substantial and material in the light of the entire record. In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Tenn. Code Ann. § 4-5-322(h)(1)-(5) (1998).

Based on the record of the administrative hearing, the chancellor found that the Board's conclusion that Johnson's conduct was unprofessional was supported by substantial and material evidence. The chancellor noted that the Board based its findings on the expert testimony presented at the hearing, as well as the independent expertise of the Board members. Consequently, the chancellor affirmed the Board's conclusion that Johnson acted in an unprofessional manner.

The chancellor then considered the Board's decision that Johnson's license should be revoked. Referring to the Board's discussion of Johnson's ability to practice alternative medicine without a medical license, the chancellor concluded that the Board revoked Johnson's license based on its desire to prevent him from further administering intravenous hydrogen peroxide treatments to patients. The chancellor found that the Board "did not present substantial and material evidence supporting the revocation of [Johnson's] license," and that "[t]he Board's reasoning underlining [sic] the revocation of [Johnson's] license does not relate to the disciplinary charges at issue." The

chancellor affirmed the civil penalties assessed against Johnson, but reversed the Board's Order of Revocation of Johnson's medical license. From this order, the Tennessee Department of Health and the Tennessee Board of Medical Examiners now appeal.

On appeal, TDOH and the Board argue that the chancery court erred in reversing the Board's decision to revoke Johnson's medical license.[7] The Appellants argue that the chancery court's decision was contrary to the specific admonition in section 4-5-322(h)(5) of the Tennessee Code Annotated that "the court shall not substitute its judgment for that of the agency as to the weight of the evidence. . . ." Tenn. Code Ann. § 4-5-322 (h)(5)(1998).

As with the trial court, our review on appeal is pursuant to section 4-5-322 of the Tennessee Code Annotated. Like the trial court, appellate review of the decision of the Tennessee Board of Medical Examiners is not *de novo*, but is confined to the record of the proceedings before the Board. *See Metro. Gov't of Nashville and Davidson County v. Shacklett*, 554 S.W.2d 601, 604 (Tenn. 1977). Under the statute, we must determine, in light of the record, if the Board's decision to revoke Johnson's license was arbitrary or capricious, constituted an abuse of discretion, or was not supported by substantial and material evidence. The decision of an administrative agency will be considered arbitrary or capricious only if there is no rational basis for its conclusion. *See Chagrasulis v. Tenn. Bd. of Med. Exam'rs*, No. M2001-01595-COA-R3-CV, 2002 Tenn. App. LEXIS 507, at *7 (Tenn. Ct. App. July 18, 2002); *MobileComm of Tenn., Inc. v. Tenn. Pub. Serv. Comm'n*, 876 S.W.2d 101, 104 (Tenn. Ct. App. 1993) (citation omitted). In ascertaining whether the facts found by the Board are supported by substantial and material evidence, the reviewing court must determine if there is "such relevant evidence as a reasonable mind might accept as adequate to support a rational conclusion and such as to furnish a reasonably sound basis for the action under consideration." *Pace v. Garbage Disposal Dist.*, 390 S.W.2d 461, 463 (Tenn. Ct. App. 1965) (citation omitted); *see also McClellan v. Bd. of Regents of the State Univ.*, 921 S.W.2d 684, 691 (Tenn. 1996). This standard "requires *something less than a preponderance of the evidence*, but more than a scintilla or glimmer." *Rodriguez v. Metro Gov't of Nashville*, No. M2001-02500-COA-R3-CV, 2002 Tenn. App. LEXIS 733, at *11 (Tenn. Ct. App. Oct. 16, 2002) (citations omitted) (emphasis added).

In this case, the chancery court found that the Board's decision to revoke Johnson's medical license was prompted by a desire to prevent him from practicing "alternative medicine." In the proceedings before the Board, however, there was ample evidence that, regardless of whether it is considered "alternative medicine," Johnson's treatment of E.H. went well beyond unorthodox, that it was below the standard of care, and was in fact dangerous. The Board heard expert testimony that the treatment methods recommended and utilized, indeed advertised by Johnson, were not simply ineffective to treat E.H.'s maladies, but could have resulted in more serious consequences, even her

_____

[7]We note that, with regard to this appeal, Petitioner/Appellee Johnson failed to submit an appellate brief to this Court. Upon Johnson's failure to submit an appellate brief, an order was filed requiring Johnson to show cause for not submitting the appeal for decision based on the record and the Appellants' brief. Johnson failed to respond to the show cause order, and the appeal, therefore, was submitted for decision based on the record and the Appellants' brief.

death.  The evidence showed that Johnson recommended ozone treatment, a poison, administered hydrogen peroxide intravenously, a dangerous treatment, injected vitamin C near E.H.'s rectum, resulting in a potentially life-threatening abscess, and then treated the abscess with a charcoal poultice mixed in a coffee can.  For this Johnson charged E.H. in excess of $4,500, and nevertheless maintained in his testimony before the Board that his treatment of E.H. was within the standard of care in the Nashville medical community.  Based on this record, the Board's decision was not arbitrary or capricious, was not an abuse of discretion, and was clearly supported by substantial and material, indeed compelling, evidence.  Consequently, we must reverse the decision of the chancery court, and uphold the Board's decision to revoke Johnson's medical license.  The chancery court's decision upholding the civil penalties assessed against Johnson was not appealed, and is therefore affirmed.

The decision of the trial court is reversed in part and affirmed in part as set forth above. Costs are taxed to appellee, James E. Johnson, for which execution may issue if necessary.


_____
HOLLY KIRBY LILLARD, JUDGE