Everett TEMPLETON,
Plaintiff-Appellant,

v.

The METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, Tennessee, and the Secretary of State for the State of Tennessee, and the Comptroller for the State of Tennessee, and the Treasurer for the State of Tennessee, Defendants-Appellees.

Court of Appeals of Tennessee,
Middle Section.

Feb. 18, 1983.

Permission to Appeal Denied by
Supreme Court April 25, 1983.

Thomas B. Cresswell, Jr., Boult, Cummings, Conners & Berry, Nashville, for plaintiff-appellant.

J.P. Apel, Deputy Director of Law, John C. Zimmerman and Jennifer Helton Small, Asst. Attys. Gen., Nashville, for defendants-appellees; William M. Leech, Jr., Atty. Gen. and Reporter, Nashville, of counsel.

## OPINION

CONNER, Judge.

This case represents a frontal assault on the validity of state statutes and an ordinance of The Metropolitan Government of Nashville and Davidson County (Metro) prohibiting the sale at retail of packaged liquor in its "general services district." The suit was engendered by and is a natural consequence of the holdings by our supreme court in *City of Chattanooga v. Tennessee Alcoholic Beverage Commission,* 525 S.W.2d 470 (Tenn.1975), and *Metropolitan Government of Nashville and Davidson County v. Shacklett,* 554 S.W.2d 601 (Tenn. 1977). The ultimate effect of these prior suits is to mandate that where by local option the sale of packaged liquor has been approved, any municipal restriction of such sale permitted by the legislature must be reasonable and serve some legitimate purpose within the scope of the police power. This concept of reasonableness has been codified in T.C.A. § 57–3–208(c), *infra,* enacted subsequent to these decisions.

On October 31, 1980, plaintiff-appellant, Everett Templeton,[1] filed suit challenging the denial by Metro of a certificate of com-

---

1. Hereinafter the parties will be referred to as in the trial court or by their names, as abbrevi- ated.

pliance under T.C.A. § 57–3–208.[2] The action was brought under T.C.A. § 57–3–208(d), *supra.* In addition to the contention that the denial of the certificate of compliance was unreasonable, Mr. Templeton challenged the failure of the Secretary of State, the Comptroller and the Treasurer for the

State of Tennessee (hereinafter "state officers") to appoint a commission under T.C.A. § 57–3–108[3] to determine whether a retail liquor license should issue.

Plaintiff also challenged the state's interpretation of and the constitutionality of T.C.A. § 57–3–205[4] as well as the constitu-

**2.** *Certificate required—Contents—Exceptions.* —(a) As a condition precedent to the issuance of a license under 57–3–204, every applicant for a license under said section shall submit with his application to the alcoholic beverage commission a certificate signed by the county executive or chairman of the county commission in which the licensed premises are to be located if outside the corporate limits of a municipality or, if within a municipality, from the mayor or a majority of the commission, city council, or legislative body of said municipality, by whatsoever name designated, or if said municipality has no mayor, from the highest executive of the municipality.

(b) Said certificate must state:

(1) That the applicant or applicants who are to be in actual charge of said business have not been convicted of a felony within a ten (10) year period immediately preceding the date of application and, if a corporation, that the executive officers or those in control have not been convicted of a felony within a ten (10) year period immediately preceding the date of the application; and further, that in the official's opinion the applicant will not violate any of the provisions of this chapter;

(2) That the applicant or applicants have secured a location for said business which complies with all restrictions of any local law, ordinance or resolution, duly adopted by the local authorities as to location within the city or county, and that the applicant or applicants meet all residency requirements, if any, established by such local authority; and

(3) That the applicant or applicants have complied with any local law, ordinance or resolution duly adopted by the local authorities regulating the number of retail licenses to be issued within the jurisdiction.

(c) Municipalities and counties are hereby authorized to limit the location of retail liquor stores and the number of licenses issued within their jurisdictions. No local law, ordinance or resolution may limit the location and number of licenses authorized under § 57–3–204, so as to unreasonably restrict the availability of alcoholic beverages for the residents of said municipalities and counties.

(d) An applicant may seek review of the denial of a certificate by instituting an action in the chancery court having jurisdiction over the municipality or county within sixty (60) days of the denial.

(e) A failure on the part of the issuing authority to grant or deny the certificate within sixty (60) days of the written application for such shall be deemed a granting of the certificate.

(f) The requirement imposed by this section to submit a certificate shall not be applicable to any applicant if:

(1) The authority of the county or municipality charged with the responsibility to issue the certificate required herein shall have failed to grant or deny the certificate within sixty (60) days after written application for such certificate is filed; or

(2) The applicant submits a final order of a court holding that the denial of the required certificate was unreasonable, as established by subsections (c) and (d) above.

**3.** *District commissions—Members—Appointment—Term of office—Qualifications—Vacancies—Service without compensation.*—(a) Whenever any civil district of any county of the state shall by virtue of § 57–3–205 meet with the requisites for the licensing of retail liquor stores to be located within such district the secretary of state, treasurer and comptroller of the state of Tennessee, or a majority of them, shall appoint a three-member commission composed of citizens and residents of the civil district involved, which said commission shall be vested with all the powers and duties with respect to the sale of alcoholic beverages within said district which may under state law be vested in the mayor and/or board of aldermen of a municipality of the state, including the right to limit the number of such stores and to limit the permissible locations within such district where such stores may be situated.

**4.** *Location of retail license restricted.*—(a) No license entitling the holder thereof to sell or deal in alcoholic spirituous beverages at retail shall be granted in respect to premises not situated within either a municipality as defined in § 57–3–101 or within a civil district of a county, which said district shall have a population of thirty thousand (30,000) persons or over according to the federal census for the year 1950 or any subsequent census, but which said civil district shall not have lying either wholly or partially within its boundaries a municipality as defined in § 57–3–101.

tionality of a Metro Ordinance, Metro Code § 5–2–3(1) (1977).[5]

After certain stipulations of fact were filed, the matter was tried non-jury on March 31, 1982. The chancellor determined that all statutes and the ordinance under attack were constitutional, the governmental interpretations were correct and the action of Metro was reasonable. Accordingly, the lawsuit was dismissed and plaintiff appealed.

The litigants stipulated in part as follows:

1. The Plaintiff Everett Templeton is a resident of Davidson County, Tennessee.

2. The Defendant ... Metro is the municipal governmental authority for the locality in which the Plaintiff resides.

3. Defendant[s] Secretary of State ... Comptroller ... and Treasurer ... are parties to this suit in their official capacity as officers of the State of Tennessee....

4. Plaintiff currently is licensed to engage in retail liquor sales under the authority of Metro and the Alcoholic Beverage Commission of the State of Tennessee (herein "ABC"). The Plaintiff has been licensed to sell liquor at retail at locations in Metro for some eighteen (18) years and has never been denied a renewal of his license, nor has he ever received an unfavorable Inspection Report by an inspector of the ABC.

5. The plaintiff currently operates a retail liquor establishment under the name of Temp's Liquor Store at 1818 Church Street in Nashville.... On or about April 12, 1979, Plaintiff filed an application with the ABC for a transfer of the liquor license currently held by Plaintiff ... to a proposed site for establishment of a liquor store at 7124 U.S. Highway 70 South in Davidson County, Tennessee.

6. On April 13, 1979, an officer of the ABC inspected the proposed location and filed a favorable Inspection Report of the proposed retail store location.... The Report contains the following information: the location has a principal access to an existing major street; it is within a major commercial development of ten acres or more; it meets the other requirements of Metro, including the requisite distance from private residences, public libraries, churches, schoolyards, and other retailers, and the area is zoned for commercial development.

7. The Plaintiff is of good moral character within the meaning of T.C.A. § 57–3–208(b)(1)....

8. Because the application for transfer involves merely a transfer of the license, and not an application for a new license, Plaintiff's application would not affect the suggested license to population ratio of 1:5500.

9. The plaintiff has complied with the applicable ordinances of Metro which regulate the number of retail licenses to be issued within the jurisdiction. The proposed location of a new liquor store by Plaintiff ... meets the requirements of Metro Code Section 5–2–3(2) (1977), which requires that the proposed location for a liquor store is on or has its principal access to an existing major street or road as shown on the major street plan as adopted by the Metropolitan Planning Commission. Highway 70 South in Nashville is such a street.

10. The proposed location for a new retail liquor establishment ... meets the requirements of Metropolitan Code Section 5–2–3(3) (1977), which requires that the proposed location be within a major commercial concentration having a land

---

**5.** ...

In addition to the locations heretofore set forth in this section, liquor may be sold at retail at other locations provided they meet the following criteria:

(1) The proposed location is within the Urban Services District.

.     .     .     .     .

area of ten (10) or more contiguous commercially developed acres.

\* \* \* \* \* \*

11. Of the establishments ... [contiguous to the proposed location] the following sell alcoholic beverages or beer:

Cheers—licensed ... to sell liquor by the drink;

Kroger—licensed ... to sell beer;

Mr. Gatti's Pizza—licensed ... to sell beer;

Wiggin's Drive-In Market—licensed ... to sell beer;

Gulf/Grand Ole Market—licensed ... to sell beer;

Fine Foods by George—licensed ... to sell beer.

12. The proposed location of the new retail liquor establishment ... is in the General Services District of Metro. Metropolitan Code Section 5–2–3(1) (1977), requires locations for retail liquor stores to be situated within the Urban Services District of Metro.

13. The proposed location for the new retail liquor establishment store is almost two (2) miles from the nearest liquor store, the West Meade Wine and Liquor Mart.

14. The proposed location is within three (3) miles of the closest fire station....

15. The proposed location is within a neighborhood that is regularly patrolled by Metro Police and Bellevue Patrol.

16. The proposed location is located in the neighborhood known as Bellevue, an area which has an estimated population of 19,392 as of 1980, according to the Metro Planning Commission. The population of Bellevue is expected to increase over the next two decades; the Planning Commission has estimated that the area will have a population of 22,890 by 1990 and 26,750 by the year 2000.

17. The Metro General Services District is a "civil district" as that term is utilized in T.C.A. § 57–3–205(a) and has a population in excess of 30,000 persons.

18. The Urban Services District of Davidson County has a population of over 30,000 persons according to the 1980 federal census.

19. Within the General Services District of Davidson County and outside the Urban Services District of Davidson County, there are six incorporated municipalities, those being (1) Belle Meade, population ... 3,182, incorporated in 1938, (2) Berry Hill, population 1,113, incorporated in 1950, (3) Goodlettsville, population 8,327, incorporated in 1958, (4) Lakewood, population 2,325, incorporated in 1959, (5) Oak Hill, population 4,609, incorporated in 1952, (6) Forrest Hills, population 4,516, incorporated in 1957....

20. The Secretary of State, the Comptroller, and the Treasurer of the State of Tennessee have not appointed a commission for the Metro General Services District within the meaning of T.C.A. § 57–3–108....

21. On September 5, 1980, Plaintiff's attorney received notice from J. Pat Apel, Deputy Director of Law, Metropolitan Government of Nashville and Davidson County, Tennessee, that the certificate required by T.C.A. § 57–3–208(2) was denied because the proposed location for the new retail liquor establishment is without the Metro Urban Services District....

22. Defendants are not aware of any reasons, other than the proposed location being situated in the Metro General Services District, why the Plaintiff's application for transfer should not be granted.

Beyond the stipulation, Mr. Templeton testified that during twenty years in the liquor business he had operated two different retail liquor stores and had never been denied a license, or received an unfavorable report. He sought transfer of a license from Temp's Liquor Store on Church Street to Highway 70 in Bellevue because of existing competition there and his belief that he

would have a better economic situation in Bellevue. Mr. Templeton had a building and lease commitment in the proposed location.

Mr. William M. Hobbs, Jr., administrative assistant to Metro Mayor Richard Fulton, testified that his responsibilities included review of applications for certificates of compliance for liquor licenses. He acknowledged that the only obstacle preventing Mr. Templeton from obtaining the requested permit was that the proposed location is outside of the urban services district. Mr. Hobbs testified the urban services district was not drawn for the purpose of alcohol licensing nor did it have anything to do with licensing until the prior segregated zone was declared too restrictive. *See Metro v. Shacklett, supra.*

Mr. Hobbs testified that there are no retail liquor stores outside of the urban services district except in satellite cities within Davidson County. However, there are liquor-by-the-drink locations. The police protection patrol zone in which Bellevue is located contains a larger geographical area than other zones. Each zone has one car for patrol purposes. The attendant government services are higher in the urban services district than for those areas outside thereof, including fire, police, garbage collection and street lighting. In return for the higher police protection and other services, those within the urban services district pay a higher tax rate than those in the general services district.

Robert Pasley, Planning Director for the Metro Planning Commission, said that the general plan for Nashville for the years 1980–2000 anticipates expansion of retail activities going outside the urban services district. The areas designated as "urbanized area" are based upon density. Bellevue receives sewer services from the Harpeth Utility District; street lights are available on the major artery of Highway 70; and it receives fire protection on a general services district basis, but not on the urban services district level. Under the general

services district fire protection, the service area is larger and the equipment is less. However, Bellevue has a volunteer fire department. Within the urban services district, a higher level of fire protection is available. Expansion in the urban services district since 1963 has been based upon annexation. Studies on expanding the urban services district into the Bellevue area resulted in the conclusion that it would not be cost effective for Metro.

Gene Nolan, assistant budget officer for Metro, testified that the metropolitan area is divided into two taxing districts. The general services district is taxed at a rate $4.02 per hundred assessed valuation on property tax while the urban services district by contrast is taxed at an additional rate of $1.91 above the general services district rate. The extra taxation in the urban services district is used to pay for additional services necessary within that district, including refuse collection, fire protection, street lighting, street cleaning and additional police protection. Moreover, a debt service fund for retirement of bonding indebtedness exists. Different bond issues exist for the two districts. The tax rates for the two districts are approved by the Metropolitan Council. State funds received and disbursed by Metro are premised upon the state's recognition of the distinctions for urban services districts, and therefore Metro receives state funds both as a municipality and as a county. For example, street lighting for the two districts is paid separately from the separate funds. Funds may not be taken from one district for use in the other. A liquor store newly located within the general services district would be taxed at a lower rate than a retail liquor store located within the urban services district.

Robert Kirchner, a captain with the Metro Police Department, and divisional commander of the Integrated Criminal Program, testified as to the planning process used in developing the various police zones in Metro, the structure of which is largely based upon population of a general area,

the historical number of calls for police service therein, road miles involved and time response of police officers. Zones 11 and 12 which border the proposed liquor store location involve a great deal of over-lapping because of the existence of apartment complexes. While planning indicated the necessity for four separate zones for police services in the area, limited resources dictated that only two zones were made available. The Bellevue patrol also located in the subject area is a private organization whereby private citizens provide security supplemental to the Metro Police Department. Liquor store security is a particular problem because it has the propensity to be "one of the most violent crimes in the major categories." There is a higher incidence of robberies in liquor stores than other retail establishments. Broadcase systems, a new police aid in liquor store hold-ups, whereby bait money taken from a cash register sends a signal directly to a car or to headquarters is extremely limited because the signal is confined to a small central area. There is a higher potential for robbery of a liquor store than a market because, among other reasons, less people frequent a liquor store increasing the likelihood that the establishment will be unoccupied. Similarly, restaurants selling liquor-by-the-drink tend to have a higher number of customers, therefore reducing the likelihood of robbery. Allowing liquor stores to move into the general services district would require redistricting of zones, reallocation of resources and increased attention to the particular area of the store. The presence of a liquor store in Bellevue would increase the demands on the car patroling the zone because Metro could not now afford to put an additional car therein. The car responsible for the area would probably spend more time in the immediate neighborhood of the liquor store because of concern of a potential robbery, and obviously less in the balance of the patrol area.

Based upon the stipulation and this testimony in holding for the defendants the chancellor found in pertinent part:

THE COURT: ... I am now prepared to state the Court's findings of fact and conclusions of law and decision as it relates to the more fundamental question of whether the statutes and ordinances which have the effect of limiting retail liquor licenses to the Urban Services District in Nashville are unconstitutional.

The Court concludes that they are not unconstitutional and declines to grant the plaintiff's relief.

At the outset, it must be pointed out that in 1980 the Legislature significantly changed the law relating to the issuance of retail liquor licenses. Before 1980 there was considerable confusion over the power of local governments to regulate the location of the number of liquor stores....

In 1980 the Legislature gave local governments the clear authority to regulate the location of liquor stores within their boundaries. Now, the wisdom of that legislation may be doubted. But unless it is unconstitutional, this Court must enforce the statute and uphold the statute.

There are two bases upon which the Metropolitan Government denied the plaintiff the certificate he seeks, pursuant to T.C.A. 57–208....

The first basis relates to a statute, and the second basis relates to a Metro ordinance. The authority of this Court to order the issuance of a certificate or grant the relief seems to be rather substantially difficult in these two situations.

In the first situation—that is, relating to the denial of the certificate based upon state statutes—the Legislature has defined a municipality in a metropolitan form of government as the Urban Services District. And since the Legislature authorizes the issuance of liquor licenses only in municipalities, it does not meet the requirements, as it is not in a municipality as defined by the Legislature. For that reason alone, the Metropolitan Government is justified in denying the

certificate, irrespective of the Metropolitan Government ordinance.

Again, one might question the wisdom of that legislation, but it's not the proper function of the Court to substitute its judgment for that of the Legislature.

The only basis upon which the Court could order the Metropolitan Government to grant the certificate would be to conclude that the statutes passed by the Legislature, which define the municipality as the Urban Services District in the metropolitan form of government and which limit the sale of liquor or retail liquor to the municipalities, are unconstitutional. In the Wainweather Supplement is the test of whether there is any rational basis for this classification or this distinction. If there is no rational basis, it's clearly an arbitrary distinction, as obviously was the case in the Shacklett case. Then it's unconstitutional.

*The distinction between the Urban Services District and the General Services District is not some arbitrary distinction.* It is not simply the arbitrary drawing of a line on a map of the city in which the decision is made that some things will be done—in this case, liquor will be sold on one side of the line and not on the other side of the line. I think the Supreme Court pointed out in the Shacklett case that there was no justification shown in the Shacklett case for why this line was drawn the way it was.

In this case, we have a totally different situation. *There is a very rational difference between what the Urban Services District is as opposed to what the General Services District is.*

*In the Urban Services District, the Metropolitan Government, which is both a city and a county, provides those services which are ordinarily provided by a municipal government. It is the city. The Metropolitan Government does not provide those services in the General Services District.* That is the part of the county that is not in the Urban Services

District. It provides—Well, it just doesn't. It's that simple.

*Essentially what the people outside the Urban Services District get as far as services are concerned are the services that the people in Davidson County received before the Metropolitan Government.* They do now have fire protection, but not as much as in the Urban Services District. *The most important municipal service which is not offered in the General Services District which is offered in the Urban Services District is police protection.*

*It may be true that demographically and from appearances, the Bellevue area is an urban area. But one only has to look at that police zone map and see that Bellevue simply does not receive the police protection that similar-sized or similarly demographically-constructed areas in Davidson County receive.*

*Now, one may dispute or disagree with the conclusions of the officials of the police department concerning the impact of a liquor store on demands on police time. But it is not the function of this Court to substitute its judgment for the Legislature or the Executive Branch either of the State or Metropolitan Government in these matters.*

*Therefore the Court concludes that the statutes which limit the sale of alcoholic beverages through retail outlets to the Urban Services District are rational. They are based upon a rational basis and are not unconstitutional.*

The second question relates to the Metropolitan ordinance, which also restricts the issuance of retail liquor licenses to the Urban Services District. For that reason I just stated, I don't think that statute is unconstitutional. In addition to determining whether it's constitutional or not, the Legislature has also apparently given the Court the authority to order the issuance of a certificate for another reason. And that is, if the Court finds that the Metropolitan ordinance unreasonably re-

stricts the availability of alcoholic beverages to residents.

Now, having determined that the statutes alone prohibit the sale or the issuance of a retail liquor license outside the Urban Services District, it's doubtful this Court needs to go further and decide whether the Metropolitan ordinance unreasonably restricts the availability of liquor or not. But I think I should go ahead and rule on that. And I cannot conclude that it not (sic) does unreasonably restrict the availability of liquor.

The Urban Services District as shown on the map comprises an enormous area of Davidson County. In fact, it includes almost all the densely-inhabited areas of Davidson County. The only densely-inhabited areas which are not included are Bellevue, Madison, and perhaps a couple of other areas. I can see the area out by Percy Priest Lake and the Old Hickory area. Certainly it would be more convenient for the people in Bellevue to have a liquor store in Bellevue. And I certainly would want to have that location if I were in the retail liquor business. I think that would be a good location. But I cannot conclude that the Metropolitan ordinance unreasonably restricts the availability of alcoholic beverages. I do believe that if this 1980 law were in effect when the same issue came up in the Shacklett case, the Court would have reached an opposite conclusion, based on this so-called zone. Based on the areas of the Urban Services District, I don't think the Court can reach that conclusion.

As I said, it would be more convenient for the people in Bellevue to have a liquor

store for themselves, but it's not an unreasonable burden for them to purchase liquor a few miles or moments away, inside the Urban Services District.

For those reasons, the Court denies the plaintiff's relief and dismisses the case.... (Emphasis supplied.)

Plaintiff here also attacks T.C.A. §§ 57–3–108 and 57–3–205, *supra,* and Metro Ordinance § 5–2–3(1), *supra,* as being unconstitutional. In the alternative Mr. Templeton contends the state officers named as defendants should have appointed a commissioner pursuant to T.C.A. § 57–3–108, *supra,* based on his interpretation of T.C.A. § 57–3–101 [6] that all of Metro is a "municipality" thereunder.

Mr. Templeton further asserts that T.C.A. § 57–3–205, *supra,* T.C.A. § 7–3–303, *infra,* and Metro Ordinance § 5–2–3(1) unreasonably deny him a retail liquor license by limiting licenses to Metro's urban services district and that the statutes contain improper classifications, contrary to the equal protection and due process clauses of the U.S. Constitution.

Pursuant to T.C.A. § 57–3–208, *supra,* a certificate of compliance, issued by the local authority, must accompany an application for a retail liquor license to the ABC. Such certificate is a condition precedent to the issuance of a license under T.C.A. § 57–3–204. The proposed location of the business must comply with all local restrictions, laws, ordinances or resolutions as to location within the city. T.C.A. § 57–3–208(b)(2). Municipalities are expressly authorized to reasonably limit the location and number of licenses issued within their juris-

---

**6.** *Definitions.*—Whenever used in this chapter, unless the context requires otherwise:

.    .    .    .    .

(9) "Municipality" means an incorporated town or city having a population of one thousand (1,000) persons or over by the federal census of 1950 or any subsequent federal census;

Provided, however, that when any incorporated town or city by ordinance authorizes a census to be taken of such incorporated town

or city and shall furnish to the commission a certified copy of said census containing the names, addresses, age and sex of each person enumerated therein and if said census shall show that said incorporated town or city has a population of one thousand (1,000) persons or over, the commission, upon verification of said census, may declare such incorporated town or city to be a "municipality" for all intents and purposes of this chapter;

.    .    .    .    .

diction. T.C.A. § 57–3–208(c). The number and location of licenses authorized under T.C.A. § 57–3–205 may not, however, be "unreasonably restrict[ed]" by local law, ordinance or resolution. T.C.A. § 57–3–208(c).

Under § 57–3–205 issuance of a liquor license is specifically restricted to those areas situated within either (1) "a municipality as defined in § 57–3–101 . . ." or within (2) "a civil district of a county, which said district shall have a population of thirty thousand (30,000) persons or over according to the federal census for the year 1950 or any subsequent census, but which said civil district shall not have lying either wholly or partially within its boundaries a municipality as defined in § 57–3–101." It is stipulated that plaintiff's proposed business location is within the Metro general services district which is a "civil district" under § 57–3–205(a) and not within one of the six incorporated municipalities in the general services district.

▓▓▓▓ We deal first with Mr. Templeton's argument that the entirety of Davidson County, and not simply the urban services district is a municipality within the definition of T.C.A. § 57–3–101, *supra.* We are unable to accept this statutory interpretation. It is contrary to the Metro enabling legislation, T.C.A. § 7–3–303;[7] the local option law, T.C.A. § 57–3–205, *supra;* and § 18.08[8] of the Metropolitan Charter. Further, § 1.05 of the Metropolitan Charter defines the functions within the two services districts. It provides that Metro may exercise within the general services district those functions exercised by the County of Davidson or the City of Nashville, or both, and that Metro may exercise within the urban services district those functions exercised by the City of Nashville or the County

---

7. *Alcoholic beverages—Regulation and taxation.*—The creation and establishment of a metropolitan government hereunder shall not alter the status of the county involved as to legality of the manufacture, receipt, sale, storage, transportation, distribution and possession of alcoholic beverages. Local option elections heretofore held in the county pursuant to §§ 57–3–106, 57–3–107 to fix such status shall continue to control the same until the status shall be subsequently altered by a local option election held pursuant to said law. Where a local option election under § 57–3–106 has heretofore permitted, or shall hereafter permit, the sale of alcoholic beverages, then the urban services district but not the general services district, shall be deemed a municipality within the meaning of said law. The metropolitan council shall have power and authority:

(1) For the general services district to regulate and tax the manufacture, distribution and sale of beer and other alcoholic beverages of less than five percent (5%) to the same extent that governing bodies of counties now possess, or may hereafter possess, such power and authority, and

(2) For the urban services district to regulate and tax the manufacture, distribution and sale of beer and other alcoholic beverages of less than five percent (5%) and also the manufacture, receipt, sale, storage, transportation, distribution and possession of other alcoholic beverages to the same extent that governing bodies of cities now possess or may hereafter possess such power and authority.

8. *Regulation and sale of alcoholic beverages not affected by Charter.*

The creation and establishment of the Metropolitan Government of Nashville and Davidson County shall not alter the status of said county as to the legality of the manufacture, receipt, sale, storage, transportation, distribution and possession of alcoholic beverages. The local option election heretofore held in said county pursuant to Tennessee Code Annotated, sections 57–111 and 57–112 shall continue to control until the status shall be subsequently altered by a local option election held pursuant to law. The urban services district, but not the general services district, shall be deemed a municipality within the meaning of said section 57–111.

The council shall have power and authority (a) for the general services district to regulate and tax the manufacture, distribution and sale of beer and other alcoholic beverages of less than five (5%) percent to the same extent that governing bodies of counties now possess, or may hereafter possess, such power and authority, and (b) for the urban services district to regulate and tax the manufacture, distribution and sale of beer and other alcoholic beverages of less than five (5%) percent and also the manufacture, receipt, sale, storage, transportation, distribution and possession of other alcoholic beverages to the same extent that governing bodies of cities now possess or may hereafter possess such power and authority.

of Davidson and shall supply the urban services district with services customarily furnished by a city government in a metropolitan area. § 1.05 further enumerates the functions of Metro in the general services district and lists additional functions to be performed in the urban services district. They include greater police protection, fire protection, water, sanitary sewers, storm sewers, street lighting, street cleaning, refuse collection and wine and whiskey supervision. § 1.04 of the Metropolitan Charter provides for expansion of the urban services district by annexation whenever the general services district needs additional urban services. §§ 6.03 and 6.07 of that charter provide for separate operation budgets for the general services district and the urban services district and the levy of property, personalty and ad valorem taxes to fund those budgets. T.C.A. § 7–3–201, part of the Metro enabling legislation, allows a metropolitan government to levy within its general services district privilege taxes which a county is now authorized to levy and within its urban services district privilege taxes which a city or municipality is now authorized to levy, obviously highlighting the distinction. "Urban services district" as defined in T.C.A. § 7–1–101(9) is:

> ... a service district within a metropolitan government in which are furnished by said metropolitan government municipal services *additional* to those provided in the general services district. (Emphasis supplied.)

Thus, it is apparent from all of these provisions that the Metro enabling legislation intended to merge the city and county governments, but did not intend to extend municipal services or municipal powers countywide. Rather, these services were intended to be limited to the urban services district. Therefore, we conclude the urban services district has the powers of a municipality, the boundaries of a municipality and, under the local option election law, is a municipality.

■ We now address Mr. Templeton's contention that the general services district, pursuant to T.C.A. §§ 57–3–108, *supra,* and 57–3–205, *supra,* is a civil district in which the retail sales of alcoholic beverages are allowed. T.C.A. § 57–3–205 restricts the sale of alcoholic beverages to a municipality or to a civil district of a county with a population of over 30,000 and with no municipalities lying wholly or partially within the civil district. T.C.A. § 57–3–108 addresses those civil districts. However, lying within the general services district of Metro is the urban services district and six incorporated municipalities meeting the definition of T.C.A. § 57–3–101. Although these six municipalities are not the primary municipality within Davidson County, each has the authority under T.C.A. § 57–3–208 to issue a Certificate of Compliance for proposed liquor stores within their respective geographical limits. *City of Lakewood v. Tennessee Alcoholic Beverage Commission,* 219 Tenn. 510, 410 S.W.2d 897 (1967). Therefore, according to the express definition of T.C.A. § 57–3–205 the general services district standing alone is not a civil district within any category which would entitle it to the appointment of a commission under T.C.A. § 57–3–108 to determine whether plaintiff should be granted a retail liquor license.

■ We now address the equal protection argument. Plaintiff contends that because his proposed location in the general services district has many, if not all, of the same planning and urban features as some locations within the urban services district the denial of a Certificate of Compliance under T.C.A. § 57–3–208 violates the equal protection clause.

■ We cannot accept this argument. First, the equal protection clause relates to equality between persons, as such, rather than between areas. Territorial uniformity is not a constitutional prerequisite. *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961); *San Anto-*

*nio Independent School District v. Rodriquez,* 411 U.S. 1, 28, 93 S.Ct. 1278, 1293–94, 36 L.Ed.2d 16, 40 (1973). The equal protection clause is offended when a public law is applied differently to different persons under similar circumstances. *See Mayor of Savannah v. Savannah Distributing Company,* 202 Ga. 559, 43 S.E.2d 704 (Ga.1947); C.J.S., Constitutional Law §§ 505, 506. According to the proof in the record there are no liquor stores in the general services district and Mr. Templeton is not being treated differently from those similarly situated. We do not believe he is being denied equal protection of the laws. *C.f. Atlanta Bowling Center, Inc. v. Allen,* 389 F.2d 713 (5th Cir.1968).

Mr. Templeton contends that "there is not a sufficient difference between the GSD and the USD for the purposes of whether a location is appropriate for a retail liquor store." Therefore, he alleges the drawing of the boundary is arbitrary, capricious and unreasonable. Though a closer question, based on the findings of the chancellor, we are unable to accept this contention of plaintiff.

■ In contesting the use of a police power by the government the plaintiff has the burden of proof to show that such use is arbitrary, capricious and unreasonable. *State, ex rel., Saperstein v. Bass,* 177 Tenn. 609, 152 S.W.2d 236 (1941). He must show that the use does not have any real tendency to carry into effect the purpose described, that is protection of the public safety, public health or the public morals. *Spencer-Sturla Company v. City of Memphis,* 155 Tenn. 70, 290 S.W. 608 (1927); *Davidson County v. Rogers,* 184 Tenn. 327, 198 S.W.2d 812 (1947); *Barret v. County of Shelby,* 619 S.W.2d 390 (Tenn.App.1981). Further, the matter is before us with a presumption of the correctness of the findings of the chancellor which were that "[t]here is a very rational difference between ... the urban services district [and] the general services district...." T.R.A.P. 13(d).

Historically, the sale of alcoholic beverages was prohibited by the 18th Amendment to the U.S. Constitution, which was repealed by the 21st Amendment. The 21st Amendment gave to the states the power to regulate the sale of alcoholic beverages which includes the right to enforce outright prohibition. *City of Chattanooga v. Tennessee Alcoholic Beverage Commission, supra* at 472, citing *Ziffrin, Inc. v. Reeves,* 308 U.S. 132, 60 S.Ct. 163, 84 L.Ed. 128 (1939). Thereafter, in 1939 the Tennessee legislature first provided for the sale of alcoholic beverages on a local option basis. This law provided for county-wide local option elections to permit the sale, among other things, of alcoholic beverages within the territorial limits of the county;

> ... provided, however, that sales at retail as herein defined shall be made only in the municipalities in said county as herein defined.

T.C.A. § 57–3–106(g)(2), a portion of the present local election law, has very similar language:

> ... sales at retail shall be made only in such portions of such counties as are within the corporate limits of municipalities as the same are defined in subsection (9) of § 57–3–101, except the provisions of this subsection shall likewise apply to any civil district which falls within the provisions of subsection (a) of this section and § 57–3–205.

Davidson County conducted a local option election, which election is still in effect. Metro Charter § 18.08.

■ The legislature has limited the sale of alcoholic beverages to within the limits of the municipalities or civil districts which do not have within their limits incorporated municipalities. We believe it was entitled to do this pursuant to the police power and pursuant to the plenary power to regulate the liquor industry granted by the U.S. Constitution. As Mr. Justice Harbison stated in *Metropolitan Government of Nashville and Davidson County v. Shacklett, supra:*

> ... It is recognized by this Court that the General Assembly has plenary power

over the subject of sale and distribution of alcoholic beverages, including the authority to prohibit the same entirely within this State if it should see fit to do so. *See Barnes v. City of Dayton,* 216 Tenn. 400, 392 S.W.2d 813 (1965); *State ex rel Major v. Cummings,* 178 Tenn. 378, 158 S.W.2d 713 (1942). It has been stated in at least two cases that no regulation of intoxicating liquor is beyond the police power of the state. *Terry v. Evans,* 189 Tenn. 345, 225 S.W.2d 255 (1949); *McCanless v. Klein,* 182 Tenn. 631, 188 S.W.2d 745 (1945).

554 S.W.2d at 607.

Numerous cases have dealt with power of municipalities to regulate the location of the sale of alcoholic beverages *within* the municipal limits. These cases, culminating in *Chattanooga v. ABC, supra,* and *Metro v. Shacklett, supra,* have generally held that municipalities have the power to set reasonable limitation on the location of the sale of alcoholic beverages within their boundaries subject to general state law.

In *Chattanooga v. ABC, supra,* the City of Chattanooga by ordinance attempted to limit the sale of liquor to a small core area of the central city comprising some 10% of its overall area. Fifty-three stores were clustered therein. That ordinance was struck down by our supreme court in a 3–2 decision. Writing for the majority the late Mr. Justice Henry stated:

In summary, the City of Chattanooga offers no reasonable justification or excuse for its oppressive and restrictive ordinance. Its action in denying the applicants a certificate of good moral character was wrongful, illegal and arbitrary.

*Id.* at 479.

This case offers some solace to plaintiff in his argument regarding the sufficiency of police protection and the unreasonableness of the Metro "lines." In *Chattanooga v. ABC, supra,* Mr. Justice Henry said:

It is suggested that it would be difficult to afford police protection to liquor stores outside the central city. Perhaps so but the same is true of branch banks and other legitimate businesses in outlying urban areas. Most assuredly a retail liquor store would create no more problems and would be no more difficult to police than a liquor-by-the-drink establishment.

*Ibid.*

In *Metro v. Shacklett,* the ABC and the trial court held arbitrary and unreasonable a Metro ordinance restricting the location of retail package liquor stores to a specified or "segregated" area of the urban services district. The supreme court affirmed. However, in *Shacklett* no effort whatsoever was made by Metro to justify the basis for the ordinance. As Mr. Justice Harbison said:

... There is a total lack of evidence in the record ... as to the history of this ordinance or the reasons for its being.... No witness testified in these cases as to how the present zone and its boundaries came to be established, or the reasons for their existence....

*Id.* at 605.

The distinguished jurist went on to state:

All parties in this litigation have cited and have given varying interpretations to the opinions of this Court in the case of *City of Chattanooga v. Tennessee Alcoholic Beverage Commission,* 525 S.W.2d 470 (1975). In that case a majority of the Court held that municipal governments have a legitimate role in regulating the *number* and location of retail package liquor outlets within their boundaries. Two members of the Court were of the opinion that local governments have had no statutory authority in this area since the enactment of certain amendments to the liquor statutes in 1949, other than in connection with the issuance of certificates of good moral character. While some members of the Court felt that cities might continue to exercise a degree of control through the granting or denial of certificates of good moral character,

the majority disagreed and held that such certificates should be issued or denied without respect to the location or number of liquor stores, and solely with reference to the personal fitness of the applicants.

If accomplishing nothing else, perhaps the issuance of the various opinions by the members of this Court in that case pointed up the lack of clarity in the existing statutes, and the need for revision of the same. . . .

In the exercise of its very broad powers in this field, the General Assembly could wholly exclude local governments from any role whatever and place exclusive control of the sale and distribution of alcoholic beverages in the state government. It could even provide for a system of state-owned liquor stores, if it felt this were appropriate. On the other hand it could remove state government from regulation, and place the subject entirely in the hands of local government or, of course, it could remove all controls and permit alcoholic beverages to be dispensed in the same manner as ordinary articles of food and drink.

The members of the Court have not altered their opinions on this subject since the decision in the *City of Chattanooga* case, *supra.* The majority still are of the opinion that under existing state statutes, local governments do have a role in prescribing the location and number of retail liquor outlets within their boundaries. Under the opinions of the plurality in that case, such control can no longer be exercised through the granting or withholding of certificates of good moral character, except in actual character investigations of the applicants. In the opinion of the majority of the members of the Court, however, regulatory ordinances on the subject, such as those of the Metropolitan Government which were upheld by the Commission in this case, are permissible. We have previously mentioned that the Commission recognized and applied Metropolitan ordi-

nances dealing with the residence of applicants, the location of retail outlets with respect to educational institutions, churches, etc., and commercial zoning ordinances.

We are not prepared to hold, nor do we hold in this case, that a municipality could never establish a "segregated zone." In the present day of widespread commercial activity and the grouping of retail outlets in shopping centers near areas of great population density, *however, real and substantial reasons for the existence of a segregated zone must be demonstrated by municipal authorities.* It is sufficient to say that such reasons were not demonstrated in the present case or in the *Chattanooga* case.

Even those members of the Court who believe that existing statutes authorize a legitimate role for local government in this field have difficulty with the position of the Metropolitan Government as developed in the present records. From the standpoint of inspection, regulation, police protection or the general welfare, it is possible that a segregated zone such as that established by the Metropolitan Government may serve a legitimate purpose. Such ordinances have been upheld in a number of other states. *See* 45 Am.Jur.2d, *Intoxicating Liquors,* § 139. On the other hand, in a day of rapid transit in a large urban community, such a zone may be utterly useless. These are matters of proof, to be established by competent evidence. The Metropolitan Government simply offered none, in the face of persuasive evidence by the applicants that they should be permitted licenses near shopping centers and other commercial areas. (Emphasis supplied.)

*Id.* at 607, 608.

■ We are of the opinion that the *City of Chattanooga* and *Shacklett* cases do not compel us to find for plaintiff. First, in the instant case there was substantial proof presented at trial and accepted by the chancellor to the effect that there were material

differences between the urban services district and the general services district which could justify the exclusion of a retail liquor store from the general services district; the most significant of these being a difference in the police protection offered by Metro, or to use the language of *Shacklett,* "real and substantial reasons" for excluding the sale of packaged liquor in the general services district were offered. *Ibid.* Second, as suggested by the *Shacklett* court and noted by the chancellor herein, the legislature which has the "plenary power over the subject of sale and distribution of alcoholic beverages" *did* revise its statutes in this regard. T.C.A. § 57–3–208(c) states very clearly that:

> Municipalities and counties are hereby authorized to limit the location of retail liquor stores. . . .

Without doubt, *Shacklett* did not rule that segregated zones in and of themselves were arbitrary and capricious even under the then existing statutory scheme.

> We are not prepared to hold, nor do we hold in this case, that a municipality could never establish a "segregated zone". . . .

*Id.* at 608.

Finally, in *City of Chattanooga v. ABC, supra* at 480, the court stated:

> . . . The Legislature has mandated an orderly procedure for [liquor] sale and that procedure should not be circumvented by strained construction either by the courts or by local governing bodies. Those dissatisfied must address their prayer for relief to the Legislature.

The proof at trial traced the development and operations of Metro and its components, the urban services district and the general services district. § 18.08 of the Metro Charter states in terms very similar to the Metro enabling legislation that the local option election heretofore held in Davidson County:

> . . . shall continue to control until the status shall be subsequently altered by a local option election held pursuant to law.

This section also provides that the urban services district and not the general services district shall be considered a municipality within the meaning of the local option election law. Metropolitan Code § 5–2–3 provides that a proposed location for the retail sale of alcoholic beverages must be within the urban services district.

Metro has vigorously asserted that the distinctions between the urban services district and the general services district, both legally and factually, are the distinctions between city and county. It contends that a metropolitan form of government simply consolidates the functions of city and county government, but does not realize the services or functions of the respective political subdivisions.

The chancellor in effect so found. This position is supported by the record. Gene Nolan, the assistant budget officer of Metro, testified as to the tax structures within the Metropolitan government area and the differences between the urban services district and the general services district. He further testified that, in the distribution of funds, the state often considers Metro in terms of city and county.

Further, the urban services district expands in the same manner, through annexation, as a city, and continually monitors and evaluates the potential expansion of city services to the old county area. The Metro proof at trial as previously recounted showed that the concentration of police services are in the urban services district and that this is commensurate with the population of the county and its crime rate.

The trial court found that there are rational differences between the urban services district and the general services district and that those differences are the differences between a city and a county. The record bears out a rational basis for placing the urban services district line where it is. As our supreme court said in reviewing the placement of zoning lines in *Brooks v. City of Memphis,* 192 Tenn. 371, 375–76, 241 S.W.2d 432, 434 (1951):

Since the complexities of modern life made the principle of municipal zoning necessary, it has been established by all the Courts that fixing the lines of the various districts making up the zoning plan, is a legislative exercise of the police power, and not a judicial function. *Meador v. City of Nashville*, 188 Tenn. 441, 220 S.W.2d 876. Than the late, great Oliver Wendell Holmes, there was never a Judge who viewed with a more sardonic eye, any modern contrivance that curtailed the old common law principle that ownership of land in fee, meant owning it from hell to heaven (*ab inferis ad coelum*), yet he said: "Looked at by itself without regard to the necessity behind it the line or point seems arbitrary. It might as well or nearly as well be a little more to one side or the other. But when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the Legislature must be accepted unless we can say that it is very wide of any reasonable mark." *Louisville Gas & E. Co. v. Coleman*, 277 U.S. 32, 48 S.Ct. 423, 426, 72 L.Ed. 770, 775.

In our view the line in this case cannot be said to be "very wide of any reasonable mark."

In the final analysis the state has given municipalities the right to regulate the location of retail liquor stores so long as the regulation is reasonable. The chancellor found this to be the case. Based on this record and existing authority we do not feel justified in overturning that finding.

It is true that the urban services district and general services district were not created for the purpose of designating where retail liquor stores could operate. It is also true that Metro Ordinance § 5–2–3(1) was promulgated after the decision in *Shacklett* and no doubt because of it. Obviously, as was pointed out in the *City of Chattanooga* case, *supra* at p. 755, it is difficult to understand why the law would allow liquor-by-the-drink establishments and retailers of beer to literally surround Mr. Templeton's proposed location without authorizing packaged liquor there. Yet, that is the status. However, there is proof in this record to the effect that retail liquor stores are more prone to robbery attempts because they have less traffic than markets, bars and taverns. This being the case can we find the action of Metro arbitrary or substitute our judgment for that of the legislature? No.

Moreover, there is another very real problem for Metro alluded to by Mr. Justice Holmes in *Louisville Gas & E. Co. v. Coleman, supra*. Even assuming that this particular location is the equal of or superior to any within the urban services district for all purposes including police protection, where can the Metro regulatory line next be drawn? No doubt less services are provided in the general services district than the urban services district, but how much less in any given area? If a retail liquor store is allowed in Bellevue, why not in Madison or Old Hickory? If there, why not in less populated areas that meet all other legislative requirements but do have less extensive police protection than exists in the urban services district?

This is a close case but we are constrained to hold that the State and Metro have demonstrated "real and substantial reasons" for "drawing the retail liquor store line" at the end of the urban services district.

Accordingly, this cause is affirmed and remanded. The costs are taxed against Mr. Templeton.

AFFIRMED AND REMANDED.

TODD, P.J. (M.S.), and LEWIS, J., concur.