IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
SEPTEMBER 21, 2006 Session

**IN THE MATTER OF: D.M.H. AND A.L.H., d/o/b 9-16-92**

**DONNA PATRICE HAMLETT v. MAURICE GIVENS**

**Direct Appeal from the Juvenile Court for Madison County**
**No. 30-0097      Christy Little, Judge**

---

**No. W2006-00270-COA-R3-JV - Filed November 8, 2006**

---

This case involves the legitimation of twin children and two subsequent actions to establish child support. In the first case, the parties agreed to attempt mediation of the issues, and it appears that a permanent parenting plan was agreed upon which provided for equal and joint custody of the children. Because parenting time was split equally, neither party was to pay support to the other, but certain expenses were to be paid by each parent. The parties allegedly signed the agreement at mediation, and a formal memorandum was subsequently drawn up and presented to the court. The court approved the formal memorandum and entered the parenting plan as an order of the court. In the second action, the mother claimed that because she had never signed the formal, typed version of the agreement, the parenting plan was void. The trial court agreed and set aside the mediated parenting plan. A new plan was entered by the court awarding primary custody to the mother and ordering the father to pay child support, which was calculated retroactively to the date of the children's birth. The father timely appealed, and for the following reasons, we reverse and remand this case for further proceedings.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Juvenile Court Reversed and Remanded**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and HOLLY M. KIRBY, J., joined.

Jay Dustin King, Jackson, TN, for Appellant

## OPINION

## I. FACTS & PROCEDURAL HISTORY

This child custody and support case, as the trial judge acknowledged , is truly "a procedural nightmare." Maurice Givens ("Father") and Donna Hamlett ("Mother") have twin children – a son, Dimanté Maurice, and a daughter, Ashanté Latrice. The twins were born on September 16, 1992. Although the parties were never married, Mother did not dispute that Father has been an active parent or that he has participated in the children's lives.[1] The children often stay with Father, he has coached his son in little league sports, and the children go to church with Father. He also claims to have provided financial support for the children since they were born.

On November, 28, 2000, Judge Christy Little of the Madison County Juvenile Court entered orders legitimating the two children and establishing that Mr. Givens is their Father. Mother subsequently filed another action in Madison County Juvenile Court to establish child support (Docket #41-35,589). A hearing on the petition was held on August 24, 2004, and the parties agreed to attend mediation in an attempt to agree on a parenting plan. In the event an agreement was reached, the judge instructed the attorneys to "just go ahead and get them to sign it while they're there, and then I'll approve it."

The parties and their attorneys attended mediation on December 21, 2004.[2] At the time, Mother was represented by Mr. J.B. Glassman, and Father's counsel was Ms. Betty Stafford Scott. Ms. Michelle Booth served as the mediator. The parties apparently reached an agreement on a permanent parenting plan, and a handwritten memorandum of the agreement was prepared by Ms. Booth.[3] The plan provided that parenting time would be divided equally between Father and Mother with the children alternating weeks at each parent's home. In the event a month had a fifth Sunday, the parties agreed that the children could attend church with Father even if they were staying at Mother's home. The plan also addressed each holiday, specifically, and summer vacations. Although parenting time was divided equally, Mother was designated primary residential parent for Ashanté and received the income tax deduction for her. Father was designated primary residential

---

[1] No sworn testimony was received in this case, and no exhibits were introduced. The record before us consists of the technical record and the transcripts from five hearings at which Father and Mother both had conversations with the judge in open court.

[2] After mediation, Mr. Glassman no longer represented Mother, and she retained Linda Sessons Taylor as counsel. In a motion filed on behalf of Mother and in a hearing, Ms. Taylor stated that the mediation took place in 2001. At another hearing she stated that the mediation was in 2003. However, she later acknowledged that the correct date was in 2004.

[3] We use the word "apparently" because Ms. Taylor, Mother's second attorney, later argued that no agreement was reached at mediation. However, she subsequently stated that "we're not disputing whatever went on in that agreement. Subsequent to that, in the four to five months, either party could change their mind." She also explained, "[a]fter [Mother] retained me, I looked over that agreement. I never would have advised her to sign that agreement." In short, it appears that an agreement was probably reached during mediation but Mother subsequently changed her mind.

parent for Dimanté and received the tax deduction for him. All major decisions were to be made by the parents jointly.

Regarding financial support, the plan provided: "[d]ue to joint, and equal parenting time, neither party shall pay child support to the other. The parties have agreed on expense [sic] that each shall pay and are listed in this parenting plan." Each parent was to deposit money each month into the children's school lunch accounts. The parties agreed on a monthly clothing allowance to be split between the parents and also agreed to split the cost of any extracurricular activities. They even agreed that the children's laundry would be taken to a certain dry cleaners. Father was to maintain health insurance for the two children. Both parties were to split the cost of co-pays and medical or dental bills not covered by insurance. The agreement provided that written court approval was required before child support could be reduced or increased.

Each paragraph of the handwritten document was initialed by the parties, and they and their attorneys signed the plan that day. A typed copy designated as a "Memorandum of Understanding" was subsequently drawn up with provisions identical to those in the signed handwritten copy. Father's counsel, Ms. Scott, signed the typed copy and presented it, along with the handwritten copy signed and initialed by both parties, to the trial judge. On April 20, 2005, the judge signed the typed copy, adopting and approving it as an order of the court.

On April 14, 2005, a few days prior to the date the judge signed the agreed-upon parenting plan, Mother filed yet another action in Madison County Juvenile Court seeking child support retroactive to the children's date of birth (Docket #30-0097). At some point, Mother had retained a different attorney and had refused to sign the typed version of the parties' mediated agreement. She also filed a request for the production of certain documents relating to Father's finances. The child support petition did not request a modification or setting aside of the previous parenting plan,[4] but it stated that "the parties attempted mediation in December, 2004. There appears to be a Memorandum of Understanding which [Father] has violated. Further, the Memorandum of Understanding does not comply with the current guidelines."[5]

Father's attorney moved to withdraw as his counsel on May 17, 2005. On May 19, 2005, a hearing took place at which Father proceeded *pro se*. Father immediately brought to the court's attention that the parties had previously agreed upon a parenting plan at mediation, and the court had signed an order approving it. Mother's counsel, Ms. Taylor, stated that the arrangement was not

---

[4] It is important to note that this second action was not a petition to modify the previous parenting plan, it did not allege a material change in circumstances, and it did not include a proposed parenting plan as required with a petition for modification. *See* Tenn. Code Ann. § 36-6-405 (2005). "If the issue before the court is a modification of the court's prior decree pertaining to custody, the petitioner must prove by a preponderance of the evidence a material change in circumstance." Tenn. Code Ann. § 36-6-101(a)(2)(B) (2005). Instead, Mother contended that it was not necessary to appeal or modify the mediated agreement because it was void or voidable *ab initio*.

[5] Significant changes to the Child Support Guidelines became effective on January 18, 2005, including the implementation of the "income shares" model requiring consideration of both parents' income.

acceptable to Mother, and "they were not able to resolve the matter in mediation." However, as previously noted, Taylor then stated that she had reviewed the agreement after Mother retained her and "never would have advised [Mother] to sign that agreement." Father reiterated that both parties, their attorneys, and the mediator had signed the handwritten agreement at mediation. He noted that the arrangements had been working well until recently. Judge Little acknowledged that the parties still shared joint custody at that point under her court order from the previous action. She also mentioned that she remembered her discussion with the attorneys that Mother had agreed to the parenting plan at mediation and signed the written agreement, but then she refused to sign the typed version.

The judge then instructed Father to employ an attorney before the next hearing at which custody and support would be determined. Father was also told to provide his financial information to Mother in response to her discovery requests. Father attempted to introduce receipts and cancelled checks showing that he had financially supported his children "from day one," but there is no indication that the documents were reviewed by the judge. Again, Father expressed his confusion as he thought the previously approved mediated agreement controlled the custody and support issues.

After the hearing, Father retained another attorney, Mr. Jesse H. Ford, III. Mr. Ford filed a counter-petition and motion to dismiss Mother's petition for child support. The motion to dismiss and a subsequent motion to quash notice of depositions referred to the previous action, Docket #41-35,589, and claimed that the current petition was without merit because all issues raised were previously adjudicated and agreed upon during mediation. Father also claimed in the motion that the court's previous order approving the parenting plan had become final because no appeal was taken from the order. Mother's answer denied that a valid parenting plan or any type of agreement existed which she was obligated to follow. She claimed that during mediation, Father had willfully concealed assets and income in an attempt to defraud her.[6] She also argued that the agreement was void or voidable *ab initio* for the following reasons: there was no meeting of the minds since Father did not truthfully present his income information; under the new 2005 Guidelines, all child support orders must take into consideration all income of the alternate residential parent; the order did not state a specific dollar amount of child support to be paid; the plan did not provide for retroactive support since the children's birth; the mediated plan was a private agreement used to circumvent the child support obligations set forth in the Guidelines; and the agreement did not mention the Guidelines or explain its deviation from the amount of support owed under the Guidelines.

A hearing on the motion to dismiss took place on July 7, 2005. Father's attorney, Mr. Ford, again described the situation with the parenting plan agreed upon at mediation. The judge stated that Father's former attorney had presented the handwritten copy with the signatures to her, and she had approved the typed version which was identical to the handwritten one. Ms. Taylor, Mother's counsel, argued that handwritten notes from mediation are only evidence of what took place, and they are not evidence that becomes part of the file unless a subsequent typed version is signed by the

---

[6] In searching public records, Mother's attorney had discovered that Father owned four houses, and he had not disclosed any rental income from the other properties.

parties. She also argued that the agreement was void because it did not consider all income of the alternate residential parent, as required by the new Guidelines. Mr. Ford responded that the agreement provided for joint custody, and Ms. Taylor stated their position that the agreement providing for joint custody was not valid.

Mr. Ford suggested that an evidentiary hearing should be held to determine whether an agreement was in fact reached at mediation. The trial judge agreed and stated that the parties' previous attorneys and the mediator should be present at that hearing. Ms. Taylor then stated that they did not dispute what went on in mediation with the agreement and argued that "[s]ubsequent to that, in the four to five months, either party could change their mind." The judge seemed to disagree and mentioned several dates which would be available for the evidentiary hearing. Ms. Taylor questioned whether Father should be required to produce the information regarding his income, and the judge responded that he did not have to turn it over to Ms. Taylor until she had heard from the mediator. Instead, he was instructed to bring the information to the evidentiary hearing. Mr. Ford suggested that the court not rule on his motion to dismiss at that time, but wait until after the evidentiary hearing. The judge seemed to agree that she needed to hear from the mediator first. The record contains an order denying Father's motion to dismiss, but it was not signed by the judge.

Unfortunately, Father's second attorney withdrew soon after the July 7th hearing. The evidentiary hearing was never scheduled. On August 26, 2005, Ms. Taylor filed a motion to impute income to Father based on the other properties he owned, and she also filed a petition to cite Father in contempt for not producing the information regarding his income and assets pursuant to a consent order entered "on or about" May of 2005. This consent order is not included in the record, and Father contends that no such consent order existed.[7] A hearing on these motions was held on September 1, 2005, and Father again proceeded *pro se*. Father pointed out that the court had previously discussed scheduling an evidentiary hearing so that the mediator and previous attorneys could discuss the parties' agreement. Ms. Taylor then told the trial judge that she had already overruled the motion to dismiss at the previous hearing, and Ms. Taylor had prepared and entered an order based on that ruling. She also stated that Father had willfully refused to provide proof of his income, and she requested that the court impute income to Father based on the other properties he owned. Father explained that he did own four houses: one that he lived in, one that his grandmother lived in because she did not have a house, and two damaged houses that he could not afford to repair, so he did not rent them. He claimed that Mother had known about the houses all along, even during mediation. Ms. Taylor suggested an amount of $200 per house to be imputed to Father.

---

[7] The court's order addressing this motion states that Father willfully refused to provide his income information in violation of a court order from July 7, 2005, the date of the previous hearing involving Mr. Ford. The order does not mention any consent order from May 2005. We will not consider the consent order for any purpose because it is not in the record before us. Appellate courts generally review only what is included in the record, not what might have been or should have been included. *Dearborne v. State*, 575 S.W.2d 259, 264 (Tenn. 1978); Tenn. R. App. P. 13(c).

Ms. Taylor also contended that child support should be figured back to 1992, to the date of the children's birth. Father again attempted to introduce "a slew of cancelled checks" showing that he had supported his children over the years. The judge then responded "we're not going back" and stated that "all we're doing is setting support." Later in the hearing, Ms. Taylor again mentioned that support should be figured back to 1992, and she stated that it should be calculated according to his current income because Father had willfully chosen not to provide other information regarding his income. The judge instructed her to figure support so that an order could be entered, and to "do the days like every other weekend." Father again asked about the effect of the signed, mediated agreement and the judge told him he needed an attorney to raise that issue. He asked for time to get an attorney and the judge said she would allow him time to employ one. She instructed Father that he had to get someone, such as Mother's former attorney, to say that the mediated agreement was approved.

Approximately one week later, on September 9, 2005, an order was entered setting child custody and support and addressing the motion to impute income and the petition to cite Father for contempt. The support was calculated according to the new incomes shares model and set from the date of the children's birth in 1992. According to the order, the court had also found that Father willfully refused to comply with its order from July 7 to provide his income information, and the petition for contempt was well taken. The court also found that Father had willfully failed to disclose that he owned rental properties, and that "[Father] admitted said failure to disclose this information." The order also provided that "[Father] admits that the properties are capable of generating income . . . ." The court imputed the sum of $200 per month per property to Father for a total of $600 per month imputed income. Father was granted standard alternate weekend visitation with the children and ordered to pay certain medical expenses. Father was ordered to pay Mother's attorney's fees, and costs were also taxed to Father. Child support was set at $1,075 per month to be paid by wage assignment. In addition, the court figured an arrearage of $167,000 to be paid by Father at $2,000 per month. The order did not mention the previously mediated agreement, nor did it set aside the court's previous order approving the agreement from April 20, 2005. The record contains a permanent parenting plan which was designated as a "new plan" rather than a plan modifying a previous plan or order. This plan was marked "ordered by the court" but it is only signed by Ms. Taylor and not by the trial judge.

On September 19, 2005, Father's new attorney, Mr. Jay Dustin King, filed a motion to set aside the court's order setting child support, imputing income, and citing Father for contempt, and he also moved to set aside the wage assignment and permanent parenting plan. In response, Ms. Taylor filed a motion for summary judgment. Mr. King filed an amended motion for a new trial and requested relief pursuant to Rule 60.02, stating that Father was under the mistaken impression that the previously entered parenting plan would control the issues in this case.

A hearing on Father's motion was held on November 3, 2005. Mr. King again explained the situation with the mediated agreement being signed, Mother refusing to sign the typed version, and the parenting plan being approved by the court. He pointed out that at that time there were actually two conflicting parenting plans on the record because the previous plan was never set aside by the

court. Mr. King suggested that the court set aside its most recent orders and "start from scratch" with an evidentiary hearing. He explained that he had spoken with the original mediator, Ms. Booth, and she was willing to discuss the fact that the parties had reached an agreement during mediation. He also mentioned the court's order regarding the child support arrearage, and he requested an evidentiary hearing at which Father could present his evidence regarding the previous payments made to support his children. He mentioned that Father's cancelled checks alone added up to about $28,000 in expenses paid on behalf of the children. In addition, he addressed the rental properties and argued that there was no proof presented regarding income to be imputed to Father.

In response, Ms. Taylor contended that "there never was a, quote/unquote, mediation agreement" because "she never signed anything." She told the judge that the mediation agreement had been addressed in the previous hearing with Father's former attorney, Mr. Ford. According to Ms. Taylor, "[t]he court made a decision on that" at the July 7 hearing. She then offered to prepare an order *nunc pro tunc*, setting aside the first permanent parenting plan. The trial judge concluded:

> I remember the hearing with Jay Ford. I don't know what happened, but at that time, I set aside the order [approving the first parenting plan] because it was presented to me that the parties agreed in the mediation, and then you brought it up at that point that she did not agree.
>
> . . .
>
> Mr. Ford, I'm certain, would sign off on that. I'm sure he remembers that we set aside the mediation agreement.

Regarding the arrearage and the previous payments made by Father, Ms. Taylor argued that he was given ample opportunities to present his evidence at prior hearings. She claimed the payments were gifts because he was not under a child support order at that time.

The judge finally made clear that she intended to deny Father's post-trial motions. At that point, Mr. King orally moved the court, pursuant to Tenn. R. Civ. P. 52.01, to provide findings of fact and conclusions of law to clarify the confusion involving the different cases, parenting plans, and orders. It appears that the findings and conclusions were never provided. An order setting aside the mediated parenting plan was entered *nunc pro tunc* on November 16, 2005. Mr. Jesse Ford did not sign the order. An order denying Father's post-trial motions was entered on November 30, 2005. Father timely filed his notice of appeal on December 20, 2005.

## II. ISSUES PRESENTED

Appellant presents the following issues for review:[8]

1.    Whether the trial court erred when it denied Father's motion to dismiss the petition for child support and failed to enforce the permanent parenting plan agreed upon at mediation in case number 41-35,589;
2.    Whether the trial court erred by imputing an additional $600 per month income to Father;
3.    Whether the trial court erred in failing to consider previous payments made for the benefit of the minor children by Father when determining child support arrears;
4.    Whether the trial court failed to provide Father the opportunity for an evidentiary hearing, thus violating his right to due process.

For the following reasons, we reverse the decision of the juvenile court and remand for further proceedings.

## III. STANDARD OF REVIEW

This Court reviews findings of fact by a trial court sitting without a jury under a *de novo* standard with a presumption of correctness for those findings. Tenn. R. Civ. P. 13(d) (2006). We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness for the trial court's conclusions. **Union Carbide Corp. v. Huddleston**, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

## IV. DISCUSSION

### A.    *Effect of the Mediated Agreement*

On appeal, Father asserts that the juvenile court erred when it denied his motion to dismiss the second child support petition due to the fact that an action to establish support had already been filed before the court, and an agreement had already been reached. Father contends that the permanent parenting plan should have been followed, or in the alternative, the court should have only voided the child support provision and upheld the provisions regarding custody. The trial court's order denying Father's motion to dismiss simply states that the motion was not well taken. According to the later order setting aside the mediated parenting plan, the court found that "no agreement was reached" at mediation. The order setting aside the mediated plan also states that the

---

[8] Mother did not file a brief on appeal, and by order of this Court, the matter was submitted for decision on the record, Father's brief, and Father's counsel's oral argument.

court "ordered the same at the hearing" on July 7, 2005. From our review of this limited record, it appears that the juvenile court's actions were erroneous.

From the beginning of this case, Father has maintained that the parties, their attorneys, and the mediator all signed and initialed a handwritten version of the parenting plan at mediation. The trial judge remembered discussing with Ms. Taylor that Mother had agreed to the plan and signed the written version, but she refused to sign the typed version. The judge also mentioned that Father's former attorney brought the handwritten copy to her which contained the parties' signatures, and she had approved the typewritten version which was identical to the handwritten version. Mother's attorney repeatedly stated that no agreement was reached at mediation, but she contradicted herself at other times by stating that they did not dispute the agreement, and she argued that Mother was free to change her mind afterwards. She also mentioned the Memorandum of Understanding in her complaint and vaguely asserts that Father had violated its terms.

Unfortunately, despite Mother's conflicting statements regarding whether an agreement was reached, we cannot conclusively address the effect of the mediated agreement because of the state of the record before us. Allegations in the pleadings are not evidence of the facts averred. *Hillhaven Corp. v. State ex rel. Manor Care, Inc.*, 565 S.W.2d 210, 212 (Tenn.1978). "Unless such facts are admitted or stipulated, they must be proved by documents, affidavits, oral testimony or other competent evidence." *Id.* Furthermore, "mere statements of counsel are not evidence or a substitute for testimony." *Metro. Gov't of Nashville & Davidson Co. v. Shacklett*, 554 S.W.2d 601, 605 (Tenn. 1977). As previously noted, there was no sworn testimony presented in this case, and no exhibits were introduced into evidence. Instead of taking evidence and hearing formal testimony, the attorneys, and sometimes the parties themselves, simply presented the facts to the judge. Witnesses are required to take an oath or affirmation before testifying, Tenn. R. Evid. 603, and in the absence of stipulations, findings of fact must come from the evidence introduced. We therefore find it necessary to remand this case for an evidentiary hearing regarding the validity of the mediated parenting plan. *See Brooks v. Brooks*, No. 01A01-9607-CV-00312, slip op. at 4 (Tenn. Ct. App. W.S. Feb. 26, 1997) (remanding case for an evidentiary hearing where no evidence of any nature was presented to the trial court); *Cf. Duggan v. Bohlen*, No. 01-A-01-9611-CV-00535, slip op. at 1-2 (Tenn. Ct. App. M.S. July 9, 1997) (failure to take evidence was harmless error because the parties were in general agreement as to the facts).

Although Ms. Taylor told the trial judge that the mediated parenting plan had been set aside during the previous hearing on July 7, the transcript from that hearing, and from the other hearings as well, does not support her statement that the plan had been set aside. Mr. Jesse Ford represented Father at the hearing held on July 7. The hearing concluded with the judge instructing the parties to schedule an evidentiary hearing regarding the validity of the mediated parenting plan. The judge stated that she wanted the mediator and the previous attorneys present at the evidentiary hearing, and she also told Father that he was not required to turn over his financial information to Ms. Taylor. Instead, he was to bring it to the evidentiary hearing. When Mr. Ford withdrew following the July 7 hearing, Ms. Taylor filed a petition to cite Father in contempt for not turning over his financial information. Ms. Taylor stated in a motion that "[t]he Court issued an order from the bench on the

7th day of July, 2005, requiring [Father] to respond to the discovery requests." She then told the judge at a later hearing that the mediated agreement had been set aside. Ms. Taylor presented a proposed order that was approved by the judge *nunc pro tunc*, setting aside the order approving the parenting plan and stating that the court "ordered the same at the hearing" on July 7, 2005. In our view, Ms. Taylor misled the trial judge into believing she had taken certain actions at the hearing. This may explain some of the procedural errors and confusion that took place in the trial court.

The *nunc pro tunc* order states that, at the July 7 hearing, the judge had concluded that "no agreement was reached." We find it necessary to discuss the effect of an agreement reached at mediation when one party subsequently "changes her mind." Until it is approved by the court, a mediated agreement is essentially contractual in nature. ***Ledbetter v. Ledbetter***, 163 S.W.3d 681, 685 (Tenn. 2005). Whether the mediated agreement is enforceable is therefore a question of law. *Id.* at 683. In *Ledbetter*, our Supreme Court concluded that an agreement made during mediation and *not* reduced to a signed writing was not an enforceable contract. *Id.* at 686. However, the Court has also determined that an agreement is an enforceable contract when reduced to writing and signed by both parties. ***See Barnes v. Barnes***, 193 S.W.3d 495, 499 (Tenn. 2006). In *Barnes*, a couple had signed a written "marital dissolution agreement" which the wife had obtained from the internet. *Id.* at 497. Neither party was represented by counsel at the time it was signed. *Id.* The husband had repudiated the agreement prior to trial, but the agreement was nevertheless held to be enforceable because it was reduced to writing and signed by the parties. *Id.*

In another case more similar to the one before us, ***McMahan v. McMahan***, No. E2004-03032-COA-R3-CV, slip op. at 4-5 (Tenn. Ct. App. E.S. Dec. 5, 2005), the court determined that a mediated agreement was enforceable even though one party later changed her mind. The McMahans were divorcing and had agreed to mediate their differences. *Id.* at 1. After seven hours of mediating, a handwritten mediation agreement containing 32 paragraphs was prepared with the input of the parties and their attorneys. *Id.* Both parties either signed or initialed each page before they left, and the mediator also signed the agreement. *Id.* at 1-2. Afterwards, one of the attorneys drafted a final judgment incorporating the marital dissolution agreement, but the wife refused to sign that version. *Id.* at 2. She raised various defenses as to the enforceability of the agreement, and the trial court held an evidentiary hearing at which the mediator and the parties testified. *Id.* The trial court enforced the agreement, finding no evidence that the handwritten document was contingent upon or even subject to the trial court's approval. *Id.* On appeal, in affirming the trial court's decision, we noted:

> In essence, Wife would have us believe that, after seven hours of mediation and the signing of the resulting document, the parties only intended to agree to later review, for possible approval, a marital dissolution agreement that contains the same 32 items addressed in the handwritten document. This argument is without merit. . . . There is no doubt that the parties anticipated that a more formal document would be drafted and signed. This, however, does not mean that the validity of their agreement as to the 32 items was contingent upon this

-10-

> being done. The parties signed the mediation agreement. We conclude from this – as did the trial court – that they signed this document to signify their agreement to its terms.

*Id.* at 6.

Similarly, in ***Myers v. Myers***, No. E2004-01362-COA-R3-CV, slip op. at 1 (Tenn. Ct. App. E.S. April 22, 2005), a six-hour mediation session was memorialized by a five-page written document drafted by the mediator and signed by the parties and their attorneys. The husband's counsel was to then draft a formal "marital dissolution agreement," but before it was completed, the wife changed her mind about the agreement. *Id.* She felt that it was unfair, and that the husband had misrepresented her interest in their property. *Id.* at 2. However, she admitted on cross-examination that she and her attorney had signed the document, along with the husband and his attorney. *Id.* The trial court enforced the agreement, and the appeals court affirmed. *Id.* at 4. "The evidence presented was that the wife had simply changed her mind, and as with any written contract, one cannot be released from one's obligations thereunder simply due to a change of heart." *Id.* In the present case, Mother could not simply abandon a written, signed, mediated agreement if she changed her mind a few months later. The agreement should not have been set aside on the basis that she simply refused to sign the formal, typed version.

On remand, if the trial judge concludes that there was, in fact, a written, signed, mediated agreement between the parties, a "best interest" analysis is still required in order to approve the mediated parenting plan. "Unless the court finds by clear and convincing evidence to the contrary, there is a presumption that joint custody is in the best interest of a minor child where the parents have agreed to joint custody . . . ." Tenn. Code Ann. § 36-6-101(a)(2)(A) (2005). We must presume that when entering her initial order approving the same mediated parenting plan, the judge considered the best interests of the children.

### *B.    Support*

Under the mediated parenting plan, Father was designated "primary residential parent" for their son, and Mother was designated "primary residential parent" for their daughter. As such, each parent may have owed child support to the other under the mediated plan's custody arrangement.[9] However, the plan provided that no child support was to be paid by either parent because parenting time was essentially equal. Father was to provide insurance for the children, and both parents were to contribute designated amounts to certain expenses. This type of arrangement may be appropriate in this case because parenting time would be split equally.[10] However, there is no bright-line rule

---

[9] Father worked for United Parcel Service ("UPS"), and Mother worked at Lane College. If each had a child support obligation to the other, the awards would likely be offset with one party paying the difference to the other.

[10] Mother cited ***Berryhill v. Rhodes***, 21 S.W.3d 188, (Tenn. 2000), in the trial court for the proposition that the mediated parenting plan was void as a "private agreement[] used to circumvent child support obligations." However, we find that *Berryhill* is distinguishable to the case at bar, as it is limited by its language to "private agreements," which are entered into by parties without court approval. *Id.* at 190. The Court also discussed Tenn. Code Ann. § 36-5-101(h) (now subsection (j)) which states that an agreement reached by parents regarding child support may be affirmed, ratified,

(continued...)

that says no child support is owed when a child's residential time is divided equally. ***Hopkins v. Hopkins***, 152 S.W.3d 447, 449 (Tenn. 2004). Although an equal division of parenting time is permissible under the Guidelines, the court must make a case-by-case determination as to the appropriate amount of support in such situations. ***Id.*** at 449-50. It may be appropriate to award less child support, or even zero support, to the primary residential parent when custody is divided equally. ***Id.*** at 450. Still, in this case, Father and Mother have agreed that some certain expenses are to be paid by each for the children's benefit. The Middle Section of this Court recently concluded that a similar parenting plan was not void when the parents shared equal parenting time. ***See Woodard v. Woodard***, No. M2004-01981-COA-R3-CV, slip op. at 6 (Tenn. Ct. App. M.S. May 16, 2006). There, the court concluded that the plan did not relieve a father of his child support obligations, even though he was excused from paying "child support," because he was still required to provide health insurance for the children, pay half of their uncovered medical expenses, and half of their dental and orthodontic care costs.[11] ***Id.*** at 2. ***But see Neal v. Neal***, No. M2003-02703-COA-R3-CV, slip op. at 1-2 (Tenn. Ct. App. M.S. Aug. 2, 2005) (vacating a parenting plan with similar provisions).

On remand, if the trial court again approves the mediated parenting plan and its child support provisions, its order must contain written findings of fact stating the reasons for the deviation from the presumptive amount calculated under the Guidelines,[12] and how application of the Guidelines would be unjust or inappropriate in this case. Tenn. Code Ann. § 36-5-101(e); Tenn. Comp. R. & Regs 1240-2-4-.07. Similarly, the court must address retroactive support on remand, and whether

---

[10](...continued)
and incorporated into a divorce decree. ***Id.*** at 191. The *Berryhill* Court noted that if parties enter into (1) written agreements, (2) approved by a court, (3) incorporated into a court order, (4) and containing an acknowledgment by the parties that they may not alter the agreement without court approval, then "they may enter into a valid agreement to set child support." ***Id.*** at 191 (discussing Tenn. Code Ann. § 36-5-101(h), now subsection (j)). ***Id.*** If, on remand, the trial court approves the mediated parenting plan and its support provisions, and it explains the reasons for any deviation from the presumptive amount in the Guidelines, then we believe the mediated parenting plan would be an acceptable agreement under *Berryhill*. ***See Day v. Day***, No. M2001-01624-COA-R9-CV, slip op. at 8 (Tenn. Ct. App. E.S. Jan. 4, 2002) (finding *Berryhill* inapplicable to a marital dissolution agreement providing for custody and child support which had been approved by the trial court).

[11] Also, in *Woodard*, the court noted that there was no evidence of an agreement to not seek support in the future should there be a material change in circumstances. *Woodard*, slip op. at 6. The mediated plan in this case does not prevent either party from seeking support should there be a material change in the parties' circumstances. It does provide that the parties would attempt to settle their disagreements by mediation.

[12] The Guidelines in effect at the time of the evidentiary hearing should apply in determining each parent's presumptive child support obligation. Tenn. Comp. R. & Regs 1240-2-4-.01, entitled "Effective Date and Applicability" provides:

> (2)(a) The Child Support Guidelines established by this Chapter shall be applicable in every judicial or administrative action to establish, modify, or enforce child support, whether temporary or permanent, whether the action is filed before or after the effective date of these rules, where a hearing which results in an order establishing, modifying, or enforcing support is held after the effective date of these rules.

the judgment should include an amount due from the date of the children's birth.  *See* Tenn. Comp. R. & Regs. 1240-2-4-.06.  However, in calculating the child support owed by the parties, the trial court should allow both parties to present evidence of their incomes[13] and properly calculate any amounts owed as arrearages.  If the court determines that Father owes an arrearage, he should be given credit for any necessaries he provided for the children which Mother either failed to provide or refused to provide.  *See Pestell v. Pestell*, No. M2005-00749-COA-R3-CV, slip op. at 5 (Tenn. Ct. App. M.S.  Aug. 24, 2006).

## V.  CONCLUSION

This Court realizes the importance of stability and continuity in children's lives.  *See Aaby v. Strange*, 924 S.W.2d 623, 627 (Tenn. 1996) (citing *Taylor v. Taylor*, 849 S.W.2d 319, 328 (Tenn. 1993)).  We also regret that the trial court's erroneous action led to a change in custody that has persisted for over a year now, and which will certainly be disrupted again if the court re-approves the previous parenting plan.  However, Father should not be bound by the trial court's error in setting aside the previous plan if it was, in fact, agreed upon at mediation.

The trial judge had originally approved the mediated parenting plan providing for joint and equal custody, and she certainly considered the children's interests when approving that plan.  We presume that the mediated plan providing for joint custody was not against the best interests of the children in April of 2005.  The need for stability and continuity in a child's environment "is reflected in the well-established rule that courts will not entertain petitions for change of custody unless there has been some change in circumstances that has rendered the custodial parent unfit or has exposed the child to some form of risk."  *Aaby*, 924 S.W.2d at 627.  Mother did not allege a "material change in circumstances" when pursuing her second petition to establish child support.  Instead, she argued that she was not obligated to follow the previous plan because she had not signed the written version of the agreement, and she stated various ways that the mediated plan from December did not comply with the new Guidelines effective in January.  These reasons were insufficient for setting aside the previously approved parenting plan providing for joint custody.

---

[13] Income from rental properties should be treated as income from self-employment.  Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)(3)(i).  The "self-employment guidelines are fashioned in such a way as to authorize the trial court to address the potential of a self-employed obligor to manipulate income for the purpose of avoiding payment of child support."  *Taylor v. Fezell*, 158 S.W.3d 352, 358 (Tenn. 2005).  In determining whether to impute income to Father, the trial court should consider whether the amount of rent he receives has changed since the petition for child support was filed.  *Cf. Taylor*, 158 S.W.3d at 359 (considering the level of a corporation's retained earnings before and after divorce when imputing income to a sole or majority shareholder).  In addition, the court should look to any other factor bearing on the issue of whether a party is manipulating his or her income to avoid a child support obligation.  *Id.*

For the aforementioned reasons, we reverse the decision of the juvenile court and remand this case for an evidentiary hearing regarding the parties' agreement to the mediated parenting plan. If the parties did, in fact, sign a written version of the plan, it is enforceable unless the court finds clear and convincing evidence that joint custody is not in the best interests of the children. However, the trial court should either modify the support provisions of the parenting plan to comply with the child support Guidelines or make a written explanation for its deviation.

Cost of this appeal are taxed to Appellee, Donna Hamlett, for which execution may issue if necessary.

_____

ALAN E. HIGHERS, JUDGE